## 66944. JACKSON v. ENSLEY.

QUILLIAN, Presiding Judge.

This case involves an action brought to recover for injuries sustained by the minor plaintiff who was struck by an automobile driven by the defendant. The jury returned a verdict that no one was at fault and the plaintiff appealed.

The sole enumeration of error is that the trial court erred in permitting the introduction into evidence of a tape recording of a statement by a certain witness.

This witness, Penny Elaine Hatcher, was a roommate of the sister of plaintiff's mother and a good friend of plaintiff's mother. Shortly after the incident when the plaintiff was struck by the vehicle, a claims investigator for State Farm Insurance Company taped an interview with the witness. Here follow some of the questions asked and the witness' responses thereto: "Q. Okay. In your own words, Mrs. Hatcher, can you tell me how that accident occurred, to the best of your knowledge? A. Yes, sir. I was in the bedroom using my phone. I was looking out the window, . . . Jeffrey [the plaintiff] was standing between two buses. He looked one way, and he looked the other. But where the buses were he couldn't see, and as he started coming out to the street he was looking in the opposite direction. And before the Ensleys [defendant] had a chance to stop, he came on out. He didn't even see him; it hit him. It wasn't their fault; I can't say it was his fault. It was just something that happened. He was out in front of them before they had a chance — they were going about twenty, maybe, twenty-five miles. Had they been going any faster they would have killed him . . . Q. . . . . Was the vehicle stopped when the impact occurred between — A. . . . . I hollered for him to stop, and it seemed like he put on his brakes about the same time the baby run into the car . . . Q. . . . . In your opinion, was there anything the driver of the automobile could have done to avoid the accident? A. Be honest with you at that point, no. There's no way he

could have avoided it." The witness stated, with regard to two buses which were parked on the side of the street: "They shouldn't have been parked there. I blame the school for the child being hit, not them." She also stated concerning the defendant and his wife who was in the vehicle at the time of the incident: "I told them that day it wasn't their fault, they felt so bad about it." She reiterated this at the close of her statement: "The main thing is that it's — I don't believe it's their fault. It was something that happened. Because the man was driving carefully, and he was driving slow. There's no way he could — you know, the child darted out, there's no way he could have avoided him. There was no carelessness on his part. And I told him that that day."

Shortly thereafter, this witness gave an affidavit which recited: "On August 8, 1980 at approximately 4:00 o'clock p.m. I was talking on the telephone and looking out the window of the front bedroom of my house. At that time, I saw Jeffrey Wayne Jackson, standing between two buses which were parked on the opposite side of 18th Street. He first looked to the right and then to the left; then he started walking across the street. I saw a car coming from my left and Jeffrey's right. The car struck him on his right hip and threw him about fifteen (15) feet straight ahead. I screamed and ran from the bedroom into the living room and told the child's parents who were in my living room what had happened. After the impact, I heard the tires screech and the car came to a halt. When the impact occurred the child was just about on the center line of the street. I was the first one to reach the child, he was trying to get up, but couldn't. Linda Oakes and myself moved him to the grass. The ambulance then arrived. When the Police Officer arrived he asked me what happened and I told him what I have recounted previously in this statement. The Officer said 'No, you mean he ran out in the street.' I said 'No, he walked.' He said, how do you know? I said, 'I saw it out my window.' At that time, David Hopkins asked me the same question, and I told him that the child had walked out into the street."

It is therefore clear that counsel for defendant had knowledge that this witness had already given two conflicting versions of the incident. Nevertheless she was called as a witness for the defendant and the following questions and answers transpired at the trial: "Q. . . . [h]e [the plaintiff] started out from between those two buses. Which way was he looking? A. He looked to the right, and then like I said, he looked back to the left, and then he looked to the right, and then he stepped out. Q. All right, are you telling this jury that when he stepped out from the buses and started walking he looked in the direction that Mr. Ensley's car was coming? A. Yes, sir. Q. All right, then what happened? A. Then about that time I saw the car and

Jeffrey was out and the car hit him. And it knocked him about fifteen-and-a-half-feet straight out. Q. How fast was Mr. Ensley's car traveling? A. I really don't know. Q. Have you ever given an estimate as to how fast he was going? A. I believe I did. Q. You don't remember what that estimate was? A. I believe it was about twenty or twenty-five. Q. Would you tell the jury whether or not when Jeffrey started out from between those two buses he was running or he was walking? A. He was walking. He wasn't running. I believe that I said in a statement that he was running — or he darted. Q. Now would you describe his movement as he went from between those buses out to where he hit Mr. Ensley's car as his darting out from between those buses? A. Well, it was like I said, he looked both directions and he kind of went out, you know, like a child will do. He didn't — I wouldn't say he was running. Q. Did he dart out? A. Real fast? No, sir. Q. Did he dart out? A. No, sir. Q. What did Mr. Ensley do at the moment that the impact occurred? A. I don't understand what you mean. Q. Did you see what Mr. Ensley did when the impact occurred? A. You mean when he hit the child did I see what he was doing in the car? Q. No, ma'am. Did you see what his car did? Did he put on brakes? A. Yes, sir. Q. All right, did he stop at about the point where the child was struck? A. Yes, sir. Q. And you're sure, are you, Mrs. Hatcher, that Jeffrey did not run out into the street and into the side of Mr. Ensley's car? A. Yes, sir. Q. Do you know from having observed, or from any other reason, what caused Mr. Ensley to hit Jeffrey? A. Uh — Q. Do you know why Mr. Ensley hit Jeffrey if he walked out from between those two buses? A. Not right at the time. But he made a statement later. I walked up to see how he was — if he was okay — because I knew he was shook-up. And he made the statement that he thought he'd hit a dog, and that he was talking to his wife at the time and didn't see the child . . . Q. . . . . Do you know what caused Mr. Ensley to strike young Jeffrey here, based on what you saw, and based on any statement you may have heard after the accident? A. The way I took it he was talking to his wife at the time and didn't see the child. Q. And that's your opinion about what caused the accident? A. Yes, sir. Q. The question is, if Mr. Ensley had been doing anything different from what you described he was doing, could he have avoided this accident? A. I believe so."

Upon the witness giving this testimony at trial, the defense moved to introduce the taped statement, portions of which we have quoted, in order to impeach the witness. The plaintiff objected on the grounds that the defendant could not impeach his own witness where it was known that her testimony would not be the same as her statement — thus no surprise; that there was not such conflict in her testimony and the statement so as to authorize its introduction; that

the statement contained opinion testimony by a non-expert witness which involved the ultimate issue to be considered by the jury. The trial judge overruled the objection and permitted the introduction of the taped statement. *Held:*

1. OCGA § 24-9-81 (Code Ann. § 38-1801) reads: "A party may not impeach a witness voluntarily called by him, except where he can show to the court that he has been entrapped by said witness by a previous contradictory statement."

It is now settled in this state that OCGA § 24-9-81 (Code Ann. § 38-1801) does not mean what it was formerly construed to mean. In a succession of decisions the Supreme Court has completely modified application of that section. First, in *Wilson v. State,* 235 Ga. 470, 475 (219 SE2d 756) it was held: "We conclude that the ends of justice are far better served by full exposure of whatever previous statements a witness might have made if his testimony conflicts with them. . . . Henceforth, for 'entrapment' under that Code Ann. § 38-1801 to exist, we will not require that the witness' testimony be a total 'surprise' nor that it be affirmatively damaging." Then, in *Gibbons v. State,* 248 Ga. 858, 862 (286 SE2d 717) it was pronounced: . . . "a prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible as substantive evidence, and is not limited in value only to impeachment purposes." The court completed the cycle with its holding in *Davis v. State,* 249 Ga. 309, 314 (290 SE2d 273) that: "Consistent with our rationale in *Wilson* and its progeny, we now remove the requirement of any show of surprise before a party is allowed to impeach his own witness. If, at the time of the questioning, a party has knowledge of a prior statement by one of his witnesses which contradicts testimony that witness has just given, that party has been sufficiently entrapped so that he may impeach his witness by use of the prior inconsistent statement." This view was reinforced somewhat obliquely in *Ranger v. State,* 249 Ga. 315, 318 (290 SE2d 63). Then it was endorsed wholeheartedly in *Green v. State,* 249 Ga. 369, 370 (2) (290 SE2d 466) and *Conyers v. State,* 249 Ga. 438, 440 (2) (291 SE2d 709).

Therefore, we may now state unequivocally that, absent some other valid objection, inconsistent statements made prior to trial are admissible without any showing of surprise as original evidence.

81 AmJur2d 608, Witnesses, § 598 contains an excellent summary of the question we must next consider. "Although it is an established rule that for purposes of impeachment a witness may be interrogated as to his prior statements made in or out of court respecting matters of fact, the courts are not agreed as to whether a nonexpert witness who testifies as to facts can be impeached or discredited by his prior contradictory expressions of opinion given by

him either by way of testimony or by way of statements made out of court. But while there is some authority to the contrary, at least where the prior expression of opinion must have been based upon some fact which is contrary to his testimony, most courts have supported the general rule that a nonexpert witness cannot be impeached or discredited by his prior conflicting opinion. The reason for the majority rule is that in matters of opinion men are likely to differ materially and such difference of opinion does not tend to affect the character, credibility, or veracity of one who may have given expression to conflicting opinions at different times or stages of an investigation. The rule has been applied to exclude the prior conflicting opinion of a witness in a civil case as to the party at fault in an accident . . ." This, of course, is another example of Georgia not being stampeded into following a rule which is in the majority. The Georgia rule is, as stated in *Bates v. State,* 4 Ga. App. 486, 490-91 (61 SE 888): "Proof of previous statements of witnesses, inconsistent with their testimony, is not confined to previous statements of facts; proof of previous expressions of opinion which are inconsistent with the testimony of the witness, and which expressions of opinion tend to detract from the value of the testimony, should be allowed for the purpose of discrediting the witness." This case was cited with approval in *Griffin v. Barrett,* 185 Ga. 443, 445 (2) (195 SE 746).

A later mention of this rule is found in *Wade v. Hopper,* 89 Ga. App. 87, 94 (7) (78 SE2d 809). It should be observed that, as was discussed in *Wade v. Hopper,* 89 Ga. App. 87, supra, and the other cases, the allowance of such opinion testimony was limited solely to the purpose of impeachment and not as evidence of fault or other fact.

We are therefore perched on the horns of the dilemma since our cases have long expounded the rule that non-expert opinion evidence is inadmissible where it constitutes commentary on the ultimate fact issue, which is within the jury's exclusive domain. *Cone v. Davis,* 66 Ga. App. 229, 234 (17 SE2d 849); *Ga. R. & Power Co. v. Head,* 155 Ga. 337 (1)(b) (116 SE 620); *Morgan v. Bell,* 189 Ga. 432, 438 (3) (5 SE2d 897). See *Whatley v. Henry,* 65 Ga. App. 668, 681 (7) (16 SE2d 214); *Harris v. State,* 188 Ga. 745, 747 (1) (4 SE2d 651). Compare *Metropolitan Life Ins. Co. v. Saul,* 189 Ga. 1 (5 SE2d 214); *Smith v. State,* 247 Ga. 612, 615 (277 SE2d 678) which hold this rule not applicable to expert testimony "where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman." 247 Ga. 612, 619.

This principle has been codified in what is now OCGA § 24-9-65 (Code Ann. § 38-1708) which reads: "Where the question under

examination, and to be decided by the jury, shall be one of opinion, any witness may swear to his opinion or belief, giving his reasons therefor. If the issue shall be as to the existence of a fact, the opinions of witnesses shall be generally inadmissible." As held in *Barron v. Chamblee,* 199 Ga. 591, 595-596 (34 SE2d 828): "This section plainly refers to two separate and distinct situations, and declares different rules in reference thereto: (1) Where the question under examination and to be decided by the jury shall be one of *opinion;* and (2) where the issue shall be as to the *existence of a fact.* In the case first mentioned, any witness may testify as to his opinion or belief, giving his reasons therefor. In the second case, the opinions of witnesses are generally inadmissible, even after giving the facts or reasons therefor; it being the province of the witness merely to state facts, and the function of the jury to form the opinions or conclusions." The legal concept has been succinctly stated in *Dual S. Enterprises v. Webb,* 138 Ga. App. 810, 811 (227 SE2d 418): " 'If the witness is asked to draw an inference of fact from data observed by him or the expert witness is asked to draw an inference of fact from data observed by him or presented by other witnesses, this is a proper question for opinion evidence. The opinion is one of fact. It is only where the drawing of the inference requires a mixture of law and fact that the question is not a proper one for opinion evidence.' " Accord, *Security Life Ins. Co. v. Blitch,* 155 Ga. App. 167, 170 (6) (270 SE2d 349). Nowhere is a violation more readily evident than when a witness is called upon to express an opinion as to fault or negligence. This is not allowed. *Corley v. Russell,* 92 Ga. App. 417, 422 (2) (88 SE2d 470). (Reversed on other grounds, *Russell v. Corley,* 212 Ga. 121 (91 SE2d 24).) Accord, *Pybus v. Goldstein,* 45 Ga. App. 669 (2) (165 SE 866); *Cone v. Davis,* 66 Ga. App. 229, 235, supra; *East Tenn., Va. & Ga. R. v. Wright & Co.,* 76 Ga. 532 (2)(c); *Mayor of Milledgeville v. Wood,* 114 Ga. 370, 374 (2) (40 SE 239); *Travelers Ins. Co. v. Thornton,* 119 Ga. 455 (1, 2) (46 SE 678).

The anomaly in this case is obvious. If the witness had remained unvarying and constant, her direct testimony involving her opinion would not have been admissible. Now, the problem arises as to whether we shall permit by indirection what is not allowable directly. The Supreme Court rule which permits evidence of contradictory pre-trial statements as substantive evidence of a fact, in our view, must refer to admissible evidence and not that which is inadmissible or incompetent. So construed, we have consistency in the law. If the pre-trial statement could have been made during the trial, then it may be introduced to contradict that witness' testimony at trial and when thus admitted it stands as substantive evidence of the fact shown. If the evidence is not of the type ordinarily admissible at trial

then it should be restrictively allowed only for the purpose of impeachment, not as substantive evidence of the fact, and the jury should be so instructed.

We adopt this rule because it is fair and acts to eliminate an unwanted "gamesmanship" aspect regarding trial procedure.

2. Having concluded that the statement insofar as it contained opinions as to ultimate fact was admissible but only for purposes of impeachment, we must determine whether its admission under the present circumstances was error. Here the rule is applicable: "If evidence is admissible for any purpose, its admission will not cause a new trial. If the purpose for which the jury can consider such evidence is limited, this furnishes matter for instruction to the jury. An omission of the court to instruct the jury as to the purpose for which they could consider such testimony will not require a new trial, in the absence of an appropriate request for that purpose." *Purvis v. Atlanta Northern R. Co.,* 145 Ga. 517, 519 (89 SE 571). Accord, *Wade v. Hopper,* 89 Ga. App. 87, 97, supra.

*Judgment affirmed. Sognier and Pope, JJ., concur.*

DECIDED SEPTEMBER 30, 1983 —
REHEARING DENIED NOVEMBER 10, 1983 —

Billy E. Moore, Jack T. Brinkley, Jr., J. Anderson Harp, Paul E. Schlam, for appellant.
Richard Y. Bradley, Robert C. Martin, Jr., for appellee.