## 70836. POUND et al. v. MEDNEY.
(337 SE2d 772)

BEASLEY, Judge.

In the fall of 1977, plaintiff Medney underwent a series of synthetic fiber hair implants performed by defendant physician Pound; the last was on December 1.

On September 29, before the implants, Medney had signed a "Consent and Release" which stated that he "has agreed to have Dr. Pound perform such experimental implantations into his skin . . . [and he] fully understands that Pound and Hairegenics, Inc. cannot guarantee the medical and esthetic results." It further stated: "[t]he effect and nature of the operation to be performed, the risks involved and complications, including infection and scarring, temporary and permanent, as well as the possible alternative methods of treatment have been fully explained to and understood by Subject and hereby acknowledges the same." It also recited that "[e]xcept for acts of negligence, [Medney] waives any right or cause of action against Hairegenics or Pound as a result of the implantation mentioned herein."

A year later Medney sued Dr. Pound individually and as an officer of the professional corporation, Edwin Pound, Jr., M.D., P.C., and the professional corporation to recover damages. He charged neg-

ligent administration of the implant procedure, failing to advise plaintiff of the risks involved and of viable procedural alternatives, misrepresenting the existence or nonexistence of the alternatives and of the success rate of the subject implant procedure, and the unauthorized practice of medicine. The complaint alleged that the consent document was fraudulently obtained.

Prior to trial, defendants moved in limine to bar the introduction into evidence of a 1974 Federal Trade Commission cease and desist order restricting Charles Reynolds Hair Center and Paron, an officer of the corporation, and their "officers, agents, representatives, employees, directly or through any corporation, subsidiary, division or other device, in connection with the advertising, [from] offering for sale, sale or distribution . . . any hair replacement product or process involving surgical implants . . . in commerce" without meeting the terms of disclosure of risk specified and without the patient's having consulted with a disinterested physician prior to the implant proceeding. The order also required Charles Reynolds and Paron to "notify the FTC prior to the creation or dissolution of subsidiaries, licensees, or franchises, which may affect compliance obligations arising out of the order and to require all successors or transferees of the business to file with the FTC an agreement to be bound by this agreement." The trial court reserved ruling on defendants' motion until such time as evidence was tendered.

Medney tendered the FTC cease and desist order at trial in an attempt to show that Dr. Pound was subject to the order, knew or ought to have known of its existence, and violated its terms. The trial court sustained defendants' objection to the admission of this evidence, concluding that the order involved a different procedure and did not affect Dr. Pound.

Despite the fact that the FTC order was excluded from the evidence, the court made several references to the order in charging the jury, including: "Plaintiff Medney contends that Pound performed the implant surgery in such a fashion as to violate an order of the Federal Trade Commission dated March 20, 1974, which required among other things strict standards of disclosure of the inherent risks involved in such a procedure and made mandatory a consultation with a physician who had no financial interest in the company that manufactured the hair implant system"; and "Medney contends that Pound knew or in the exercise of the requisite degree of skill and care should have known of the existence of this order." Both parties excepted to these references. The trial court, upon plaintiff's motion, then reopened the evidence over defendants' objection and admitted into evidence the FTC order and documents related thereto which had previously been excluded. The documents were sent to the jury without further comment.

The jury returned a verdict for plaintiff in the amount of $50,000 compensatory damages and $300,000 punitive damages. Judgment was entered upon the verdict, and defendants appealed.

1. Defendants contend that the trial court erred in admitting into evidence the FTC order and related documents because they were irrelevant and extremely prejudicial.

Defendants' counsel specifically requested that the contentions of the parties set out in the pretrial order be read in the court's charge to the jury, praying only that those claims which had previously been abandoned be omitted. The references to the FTC order were included in these contentions and were read verbatim from the pretrial order. As the court complied with defendants' request, they cannot assert on appeal that the court erred in so doing, nor can they argue that the introduction of evidence upon which these contentions were based is error. See *J & F Car Care Svc. v. Russell Corp.*, 166 Ga. App. 888 (305 SE2d 504) (1983).

Secondly, " '[q]uestions of relevancy of evidence, which includes the issue of materiality, are for the (trial) court, and in the absence of an abuse of judicial discretion, this court will not interfere.' [Cit.] '(B)road discretion is reposed in the trial court whose decision will not be disturbed except in cases demonstrating a clear abuse of that discretion.' [Cit.]" *Metro. Property &c. Ins. Co. v. Shepherd*, 166 Ga. App. 300, 301 (1) (304 SE2d 74) (1983).

The FTC order, by its express language, ran to Charles Reynolds and Paron and their "officers, agents, representatives, and employees, directly or through any corporation, subsidiary, division or other device, in connection with the advertising, offering for sale, or distribution of any hair replacement product or process involving surgical implants . . . in commerce."

Plaintiff asserted that Dr. Pound's implant practice was so intertwined with Paron's business operations as to be its alter ego. In support, plaintiff introduced the following evidence: Hairegenics, Inc., a Georgia corporation, provided the implant procedure used on plaintiff. Dr. Pound and a Mr. Miller sat on the corporation's initial board of directors, and at the time of plaintiff's implant, Pound was corporate vice president. Paron helped with the corporate research and gave money to aid in continued research. From approximately November of 1976 to the winter of the following year, there were at least three or four meetings between Dr. Pound, Paron and Miller to discuss the possibility of a Hairegenics, Inc. in Massachusetts. At the time of plaintiff's implant, Paron was running the since-established Massachusetts business, also called Hairegenics, Inc. A relationship existed between Hairegenics, Inc. of Georgia and the Hairegenics, Inc. of Massachusetts, whereby the Georgia corporation received a percentage of the Massachusetts corporation's profits. Paron's Massachu-

setts corporation corresponded with plaintiff following his implant procedure, which Miller described as a "follow-up." Miller was involved in a limited partnership of a marketing company, Hairegenics, Ltd., in his capacity as an officer of Hairegenics, Inc. of Georgia as a limited partner; Paron was the general partner. Hairegenics, Ltd. actively sought to franchise its artificial hair implant business. Dr. Pound and Miller flew to California with photographs of plaintiff's procedure, met with California investors, and signed a franchise agreement. Paron financed a party held in Atlanta to "show . . . the patients . . . tested [with hair implants] up to that point" to "European associates."

There was no abuse of discretion in the trial court's ruling that the FTC order and related documents were admissible. "Any evidence is relevant which logically tends to prove or to disprove any material fact which is at issue in the case, and every act or circumstance serving to elucidate or throw light upon a material issue or issues is relevant. [Cit.] Moreover where the relevancy or competency of evidence is doubtful, it should be admitted and its weight left to the determination of the jury. [Cits.]" *Kelly v. Floor Bazaar*, 153 Ga. App. 163, 165 (264 SE2d 697) (1980). The fact that Dr. Pound was not specifically named in the FTC order does not end the inquiry into relevancy. As discussed above, there was ample evidence of a relationship between Paron, and his Massachusetts Company corporation, and Dr. Pound, and his Georgia corporation, arguably subjecting them to the order's prohibition. A separate issue was whether the consent and release document signed by plaintiff was enforceable. Even if Dr. Pound was not bound by the FTC order, did he know or should he have known of the cease and desist order? If so, did a duty arise to disclose to plaintiff before obtaining his consent, the existence of the order barring a similar, and arguably identical, hair implant procedure? Along this line is the question of whether the consent and release order signed by plaintiff was fraudulently obtained due to Dr. Pound's failure to disclose the fact of the order. There was also the question of whether the procedure at issue was so similar to that barred by the FTC order that the documents were relevant to show the procedure used on plaintiff was not good medical practice.

Nor do we find that the documents are inadmissible because their "probative value is substantially outweighed by the risk that its admission will . . . create substantial danger of undue prejudice or of confusing the issues or of misleading the jury." *Metro. Property*, supra, 166 Ga. App. at 301.

Defendants argue that they were deprived of the opportunity to address the documents in closing argument. The transcript, however, reflects no request to reargue or reopen closing comments to the jury, and this court will not consider issues raised for the first time on ap-

peal. *Hammond v. Paul*, 249 Ga. 241 (1) (290 SE2d 54) (1982); see also *Morse v. MARTA*, 161 Ga. App. 405, 406 (2) (288 SE2d 275) (1982). The trial court was not obligated to offer the parties, sua sponte, the opportunity.

2. Defendants next contend that the trial court erred in admitting evidence of a 1979 FDA confiscation of materials used in connection with the synthetic fiber implant and other FDA investigations conducted subsequent to plaintiff's implant procedure as being irrelevant and prejudicial.

Defendants assert that evidence of the confiscation was improperly introduced through the following question posed to Dr. Pound upon his being called as an opposite party: "You are aware that two weeks after you testified before the Food & Drug Administration, that the Food & Drug Administration raided Mr. Paul Miller and Hairegenics place of business and confiscated all of the materials that you were using in this synthetic fiber implant?" Counsel's question, however, was not evidence. See *Parmer v. State*, 236 Ga. 507 (2) (224 SE2d 375) (1976). What was evidence was Dr. Pound's response: "No. You are wrong. It was not the FDA that did that. It was ITC, ICC or something like that, and they did confiscate Paul's [Miller's] materials and everything because there was some question about interstate commerce, not about the method itself. And certainly I had nothing to do with that." Thus, evidence elicited by plaintiff that there was no FDA confiscation and that the "raid" counsel referred to had nothing to do with defendant was not prejudicial. Moreover, evidence of FDA investigations had already been admitted without objection under Miller's testimony that the possibility of Hairegenics, Inc. doing business in the future was "extremely remote due to the Food and Drug Administration's investigation of the entire hair implant industry." "Where evidence of a certain fact is admitted without objection, it is harmless error if incompetent or inadmissible evidence of the same fact is also admitted. [Cit.]" *Glass v. Lowery*, 168 Ga. App. 153 (2) (308 SE2d 616) (1983).

What defendants appear to be arguing is that plaintiff's counsel exceeded the proper scope of examination by questioning Dr. Pound about his knowledge of FDA activities subsequent to plaintiff's 1977 implant. Because Dr. Pound was called to testify as an opposite party, we must view the examination as cross-examination. OCGA § 24-9-81.

The questioning was an attempt to impeach the credibility of Dr. Pound. Generally, "a party may show anything which in the slightest degree affects the credit of an opposing witness." *Atlanta Recycled &c. Co. v. Tri-Cities &c. Co.*, 152 Ga. App. 259, 263 (1) (262 SE2d 554) (1979). "A witness may be impeached on a collateral issue which is indirectly material to the issue in the case." *Glo-Ann Plastic Indus. v. Peak Textiles*, 134 Ga. App. 924, 928 (4) (216 SE2d 715) (1975).

"Evidence tendered for impeachment purposes need not be of the kind or quality required for proving the facts." *State Hwy. Dept. v. Raines*, 129 Ga. App. 123, 127 (3) (199 SE2d 96) (1973).

Pound had testified that to his recollection the FDA never disapproved of his procedure and that the procedure had produced favorable results. He had stopped, he said, due to the potential threat of lawsuits and because he no longer had a source of the materials required. Medney sought to show that these responses were untrue and that the real reason Pound had stopped was that all of the materials used had been confiscated by the FDA and that FDA investigations of the hair implant industry had put the business in a "virtual standstill."

In addition, the evidence was admissible to show a prior inconsistent statement. Dr. Pound had previously appeared before the FDA and stated Miller had told him the FDA had raided his factory, yet he testified at trial that he had "got[ten] the government agency wrong . . . It had nothing to do with the FDA, I don't think." The trial court, therefore, did not err in allowing this line of questioning for purposes of impeachment. " 'If evidence is admissible for any purpose, its admission will not cause a new trial. If the purpose for which the jury can consider such evidence is limited, this furnishes matter for instruction to the jury. An omission of the court to instruct the jury as to the purpose for which they could consider such testimony will not require a new trial, in the absence of an appropriate request for that purpose.' [Cits.]" *Jackson v. Ensley*, 168 Ga. App. 822, 828 (2) (310 SE2d 707) (1983).

3. Next, defendants contend that the trial court "express[ed] . . . an opinion as to what has or has not been proved" in violation of OCGA § 9-10-7.

Upon being questioned about whether he was aware the FDA had banned the implant procedure, Pound testified that he had appeared before the FDA in 1979 and was told, "We will allow you to continue your technique, but we are going to stop all other people from doing synthetic hair implants." The judge then asked several questions relating to whether the ruling was written, and the witness said it was not.

Defendants assert that the court's questions were argumentative, overbearing, inferred that the FDA never has a hearing without it being recorded, and inferred that Dr. Pound should have brought forth other evidence to exonerate himself. We cannot so characterize the court's inquiry. "[T]he trial court has a right to propound questions to any witness in order to develop fully the truth of a case." *McDaniel v. Anderson*, 155 Ga. App. 942, 943 (2) (274 SE2d 56) (1980). Upon a review of the transcript, we conclude that the trial court did not state its opinion as to what the evidence, or lack thereof, proved. The

disinterestedness of the court was further affirmed to the jury by the court's charge.

4. Defendants next state that the trial court erred in allowing plaintiff's counsel to cross-examine Dr. Pound with reference to a treatise not qualified as authoritative and which was not written until two years after plaintiff underwent the hair implant procedure.

"[A]n expert witness may be cross-examined by reference to a standard treatise in the field of the expert's special knowledge to test his credibility . . . [However] an expert cannot be cross-examined upon a treatise which has not been proved to be a standard treatise on the subject." *State Hwy. Dept. v. Willis,* 106 Ga. App. 821, 824 (3) (128 SE2d 351) (1962). A party can prove by cross-examination of an opposing party's expert that a treatise is standard on the subject. *Wooten v. Dept. of Human Resources,* 152 Ga. App. 304, 307 (2) (262 SE2d 583) (1979); see also *Mize v. State,* 240 Ga. 197, 198 (4) (240 SE2d 11) (1977).

Dr. Pound testified as an expert on hair implant procedures. An article in the Journal of the American Medical Association discussing hair implantations was used in cross-examination. Contrary to defendants' contention that the treatise was not qualified as authoritative, Dr. Pound himself qualified the treatise as a standard treatise. When plaintiff's counsel asked, "The Journal of the American Medical Association is certainly considered to be a learned treatise by medical doctors, is it not sir?" Dr. Pound responded, "It's one of the best." To the question, "I am sure you agree that when the American Medical Association speaks, it is authoritative, true?" Dr. Pound responded, "In most things, yes." And, when asked if "the American Medical Association's Authoritative and Beauty Guide to . . . Your Skin and Hair" was authoritative because it was "put out by the American Medical Association," the witness answered, "I would say it should be, but I will not say it is."

It was not necessary for Dr. Pound to have qualified as authoritative the specific article referred to, since he did not limit his assessment to this selective scope. Defendants' challenge is also that the implant procedure discussed in the Journal article is not the same procedure conducted on plaintiff and that because the article was written two years after plaintiff's procedure, at a time when the problems of implants had become known to the medical community, the article was not relevant. This addresses itself to whether Dr. Pound's testimony was in fact impeached by the use of the article, a matter for jury determination, not to whether the article could be used for cross-examination purposes.

5. Lastly, defendants assert that the trial court erred in charging the jury on punitive damages in that the charge suggested punitive damages could be awarded on either the negligence count or the fraud

count. They argue that there was no evidence of aggravating circumstances with regard to the negligence claim.

Punitive damages may be awarded "[i]n a tort action in which there are aggravating circumstances, in either the act or the intention, . . . [so as to] deter the wrongdoer from repeating the trespass or as compensation for the wounded feelings of the plaintiff." OCGA § 51-12-5; *Woodbury v. Whitmire*, 246 Ga. 349 (271 SE2d 491) (1980). " 'To authorize the imposition of punitive damages there must be evidence of wilful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences. The latter expression relates to an intentional disregard of the rights of another, knowingly or wilfully disregarding such rights.' [Cit.]" *Bowen v. Waters*, 170 Ga. App. 65, 67 (2) (316 SE2d 497) (1984).

Plaintiff testified at trial that he had originally sought a hair transplant, where natural hair is used, but Dr. Pound had advised against it, stating that the transplant technique would not work and was not effective. There was evidence that the transplant technique was the medically accepted technique. Yet Dr. Pound chose to subject plaintiff instead to an experimental and medically unaccepted implant procedure involving the use of synthetic hair fibers, which he ought to have known could or would cause "irritation and bleeding, headaches and swelling, redness . . . followed by some loss of fiber, breakage, infection, even abcess and foreign body granuloma formation . . . [which is] tender red nodules in the skin . . . and a type of acne . . . which in itself can lend itself to infections." A witness for plaintiff testified that the principle of "foreign body rejection," which creates the complications of the implant procedure, should have been known to any medical school graduate and that there was literature available at the time condemning similar implant procedures. There was also testimony that the fibers used in the procedure at issue were thousands of times more likely to cause complications than other similar, and also controversial, implant procedures. There was evidence that Dr. Pound used "very poor judgment" in using the procedure and that defendants failed to gain FDA approval before using the experimental procedure on human subjects as required. There was some evidence that the procedure at issue was covered under the FTC cease and desist order and that, through their involvement with Paron and in franchising the implant procedure, they knowingly violated the FTC order, or at least ought to have known that they were violating the order.

The evidence authorized the charge. Also, the court's charge correctly instructed the jury in what regard it could consider punitive damages. The jury was not misled, as in the case of *Marriott Corp. v. American Academy of Psychotherapists*, 157 Ga. App. 497, 499 (2)

(277 SE2d 785) (1981).
*Judgment affirmed. Deen, P. J., and Pope, J., concur.*

DECIDED OCTOBER 23, 1985 —
REHEARING DENIED NOVEMBER 7, 1985 —

*Michael G. Frick, John E. Hall, Jr.*, for appellants.
*L. Lin Wood, Jr., Seaton Purdom, Irwin W. Stolz, Jr.*, for appellee.