A92A0494. BRANNEN v. PRINCE et al.
(421 SE2d 76)

BEASLEY, Judge.

Caroline Louise Brannen, represented by her husband as next friend and legal guardian, filed suit against Alan D. Prince, M. D. and Marietta Neurological Associates, P. C. for negligence and medical malpractice. She appeals after denial of her motion for new trial which followed a verdict and judgment for defendants.

Evidence presented to the jury showed that on January 3, 1983, a hysterectomy was performed on Mrs. Brannen, she was discharged from the hospital on January 12, and while at home on January 16 she suffered from severe headaches and lost vision in her left eye. Mrs. Brannen was taken to the emergency room at Paulding Memorial Hospital and transferred to Kennestone Hospital, where she was examined by Dr. Prince. He diagnosed Mrs. Brannen as having a vascular insufficiency in the form of an arterial occlusion and prescribed the drug Heparin, a blood thinning agent. On January 19, Mrs. Brannen sustained permanent massive brain damage from an intracerebral hemorrhage caused by the rupturing and bleeding of an aneurysm in her brain, which had not been diagnosed by Dr. Prince. She has since lost control of all bodily functions and is confined to a medically supervised nursing home. Mrs. Brannen's expert witness in the field of neurology testified that Dr. Prince failed to exercise the applicable standard of care and skill in treating her after she was hospitalized, specifically in not having a CT scan and an angiogram done before administering the Heparin, thereby causing her injuries and damages.

1. Mrs. Brannen protests the refusal of the trial court to allow her to introduce in evidence, after redirect, a two-page letter from her expert witness to her attorney. Her list of documentary evidence in

the pre-trial order, to which the trial court adhered throughout the trial, did not include the report. The letter had been obtained by defendants after the court granted a motion to compel production of documents. Defendants used a blown-up copy of it, which was displayed to the whole court and which contained the witness' medical opinion, to impeach his testimony during cross-examination.

In *Seaboard Coastline R. Co. v. Duncan*, 123 Ga. App. 479, 480 (1) (181 SE2d 535) (1971), defense counsel cross-examined the plaintiff on the content of portions of a pre-trial statement made to the defendant's agent. On redirect the plaintiff was allowed over objection to relate the content of other parts of her statement to the agent, which this court found to be erroneous, stating: "The content of the statement brought out on cross examination was a matter that was admitted only for the purpose of affecting the credibility of the testimony of the witness. It cannot be said that it was admitted in evidence as substantive proof of the facts contained in the statement. Thus it was error for the court to allow plaintiff on redirect examination to relate other portions of her pre-trial statement to the claim agent, as [present OCGA § 24-3-38] is not applicable." See also *Legare v. State*, 243 Ga. 744 (20) (257 SE2d 247) (1979), cert. den. 444 U. S. 984. Consequently, we cannot say that the trial court's refusal to admit the entire report constituted reversible error. Nor, since plaintiff's counsel was expressly invited to question the witness about it on redirect, can it be said that she was harmed.

2. Plaintiff contends that the court erred in failing to require defendants' expert witness to respond to a question indicating that *he* would not have treated Mrs. Brannen as Dr. Prince did. Eliciting what course this doctor personally would have followed was not a proper means to impeach his testimony as to the general standard of care required of Dr. Prince.

"The law of this state requires the courts of this state to presume that a physician exercises his skills in the medical and surgical field in a skillful manner. [Cit.] The burden is on the one who denies it to show a lack of due care, skill, and diligence. [Cits.] In such a case the proof ordinarily required to overcome such presumption of care, skill, and diligence is that given by physicians or surgeons as expert witnesses ([cit.]), and this standard should be that exercised by the medical community generally, not what a particular doctor would do in the circumstances. [Cit.]" *Slack v. Moorhead*, 152 Ga. App. 68, 71 (262 SE2d 186) (1979). "Testimony showing a mere difference in views between surgeons as to operating techniques, or as to medical judgment exercised, is insufficient to support an action for malpractice where it is shown that the procedure preferred by each, or the judgment exercised, is an acceptable and customary method. . . ." *Hayes v. Brown*, 108 Ga. App. 360, 361 (2) (133 SE2d 102) (1963). See

also *Laughridge v. Moss,* 163 Ga. App. 427 (3) (294 SE2d 672) (1982).

Defendants' witness testified that in his opinion Dr. Prince acted within that degree of medical care and skill ordinarily exercised by physicians generally with respect to his care and treatment of Mrs. Brannen. Any testimony elicited on cross-examination that the witness would not have administered Heparin to her would have been immaterial and irrelevant because not impeaching.

3. Plaintiff asserts that the trial judge to whom the case was assigned should have been disqualified because his former law partner had represented the defendant Marietta Neurological Associates when it was incorporated and because one of its founding doctors was a fraternity brother and long-time friend of the judge. The motion to recuse was considered by another judge who concluded that no reasonable basis existed for finding that an appearance of impropriety had been created or that the trial court's impartiality might reasonably be questioned pursuant to Canon 3 (C) (1).

Appellant concedes that she does not contend the judge was "disqualified pursuant to the strict legal requirements of OCGA § 15-1-8," but founds her arguments on Canons 2 and 3 (C) (1) of the Code of Judicial Conduct. The circumstances in which a judge may be disqualified are set out in the statute. "These grounds are exhaustive, and bias or prejudice on the part of the judge is not legal ground for disqualification. [Cits.]" *Stevenson v. Stevenson,* 222 Ga. 47, 50 (3) (148 SE2d 388) (1966). " 'Prejudice, bias or prejudgment or even an exhibition of partisan feeling, when not arising from (the statutory) grounds, is ordinarily not assignable as a ground of disqualification.' [Cits.]" *Moon v. State,* 154 Ga. App. 312, 314 (4) (268 SE2d 366) (1980). Denial of the motion did not constitute legal error. This is not to say that Canon 2 or Canon 3 (C) (1) was violated, but rather that we do not address their application because they are not the legal test.

4. The next question is whether the court erroneously allowed appellant's expert witness to be cross-examined regarding an article in a medical periodical which he had not read, because the questions and defense counsel's reading from the article amounted to prejudicial hearsay testimony. She contends that this article was not a standard treatise on the area of the witness' expertise.

The witness was a neurologist and distinguished his practice from that of a neurosurgeon, saying that a neurosurgeon operates but a neurologist does not. (Vol. 1, T. 6) "[A]n expert witness may be cross-examined by reference to a standard treatise in the field of the expert's special knowledge to test his credibility . . . ," but not until it has been shown to be "a reputable, standard treatise on the subject. . . ." *State Hwy. Dept. v. Willis,* 106 Ga. App. 821, 824 (3) (128 SE2d 351) (1962). See *Carreker v. Harper,* 196 Ga. App. 658, 659 (2)

(396 SE2d 587) (1990). The *Willis* case references CJS and Green, Ga. Law of Evidence rather than any case authority, although the much earlier Supreme Court case of *Boswell v. State*, 114 Ga. 40, 43 (3) (39 SE 897) (1901), dealt with the related subject of "medical books" as the basis for the expert witness' opinion. *Boswell* cited earlier cases for the evidentiary rules that "books of science and art" are inadmissible to prove the opinions of the experts as expressed in the books but that these opinions were in effect admissible when adopted as his own by the testifying expert. CJS speaks of cross-examination on the expert's knowledge of "authoritative opinions" and "the authorities" and "standard treatises." Green speaks of cross-examination on "standard treatises."

Such cross-examination, which aims at impeachment of the expert's opinion, as here, or, as CJS puts it, "to test the knowledge and reading and accuracy of the witness," pits what is in the treatise against the expert's analysis of the particular case. Of course, "[b]ooks of science and art are not admissible in evidence to prove the opinions of experts therein expressed." *Boswell v. State*, supra at 43 (3); *Dean v. State*, 250 Ga. 77, 82 (4) (295 SE2d 306) (1982). See also *Flemister v. Central Ga. Power Co.*, 140 Ga. 511, 515 (5) (79 SE 148) (1913); *Austin v. Kaufman*, 203 Ga. App. 704 (417 SE2d 660) (1992). CJS speaks of this improper purpose as being "in order to get [the books'] contents and the opinions of their authors before the jury." That would be inadmissible because hearsay.

"A party can prove by cross-examination of an opposing party's expert that a treatise is standard on the subject. [Cits.]" *Pound v. Medney*, 176 Ga. App. 756, 762 (4) (337 SE2d 772). The appellant's expert, a neurologist, was asked if he was familiar with a journal called Neurosurgery, to which he replied affirmatively. He agreed with the cross-examiner that the periodical was "commonly read and referred to by members of the neurosurgical profession or the medical profession with interest in this area," and was "a useful reference and text" to which he was "not a stranger."

He was not familiar with the particular article upon which defense counsel sought to question him. It was a report of a controlled study of a particular course of treatment of aneurysm patients. His testimony was sufficient to demonstrate that the journal sought to be used was authoritative and therefore a proper subject for his cross-examination. What he said was not qualitatively different from the foundation laid in *Pound*, supra, where the expert agreed that the Journal of the American Medical Association was a learned treatise and authoritative "in most things." Compare also the foundation, deemed sufficient, which was laid in *Mize v. State*, 240 Ga. 197, 198 (4) (240 SE2d 11) (1977). Although he was not familiar with the particular article which was the subject of cross-examination, "[i]t was

not necessary for [him] to have qualified as authoritative the specific article referred to, since he did not limit his assessment to this selective scope." *Pound*, supra at 762.

Although the witness disagreed with the opinion of the article's authors as related by the cross-examiner and stated that the authors' course of treatment as related by the cross-examiner was foreign to him and was not done routinely by local neurosurgeons, this did not render the cross-examination improper or destroy the foundation for it.

The admission of evidence is a matter resting largely in the sound discretion of the trial court. *Santone v. State*, 187 Ga. App. 789, 792 (3) (371 SE2d 428) (1988). The appellate court will not interfere in the absence of abuse. *MacNerland v. Johnson*, 137 Ga. App. 541, 542 (1) (224 SE2d 431) (1976). Keeping in mind that by law "[t]he right of a thorough and sifting cross-examination shall belong to every party as to the witnesses called against him," OCGA § 24-9-64, we conclude that the court did not abuse its discretion in deeming the foundation to have been properly laid and in permitting the testing of the witness' expertise in the manner undertaken.

5. Defense counsel asked the defendants' expert witness some preliminary questions concerning his family background, age, occupation, marital status, community service and other outside activities. One question asked whether he had participated in a particular religious program and to describe it. Plaintiff objected on the ground that it did not relate to the witness' qualifications as an expert. The objection was overruled and the witness briefly identified the program and said he had attended. This testimony was not prejudicial to the plaintiff, as she urges. OCGA § 24-2-2 precludes the admission only of character and conduct of parties to the suit, not non-party witnesses. This question served only to help introduce the witness to the jury and to contribute to establishment of his credibility; it presents no basis for reversing the jury's verdict.

6. Appellant enumerates as error the giving of two of appellees' charges on the ground that taken together they were cumulative and unduly advanced and placed the court's approval upon the defendants' theory of the case. The court first charged that "physicians are under the duty to exercise only such reasonable care in looking after and protecting a patient that the patient's condition, which is known by the physician, may require. Accordingly, no physician is required to guard against or take measures to prevent that which a reasonable physician under similar circumstances would not see or anticipate as likely to happen." This correctly instructed the jury on the foreseeability standard applicable to medical malpractice cases. See *Willis v. Emory Univ.*, 94 Ga. App. 734 (1) (96 SE2d 220) (1956).

The other charge was taken from *Haynes v. Hoffman*, 164 Ga.

App. 236, 238 (3) (296 SE2d 216) (1982). It has been approved as a suitable instruction on the distinction between foresight and hindsight, the former of which is the basis for a negligence claim. See *Holbrook v. Fokes*, 195 Ga. App. 418 (393 SE2d 718) (1990), and cases cited. In *McCoy v. Alvista Care Home*, 194 Ga. App. 599 (391 SE2d 419) (1990), upon which the appellant relies, it was disapproved because the defendant did not claim lack of knowledge of the patient's condition but only that the care given the patient was proper under the circumstances.

Dr. Prince did not have access to all the pertinent medical background of the plaintiff, including her apparent sensitivity to Heparin, at the time he treated her. Had he known she had an aneurysm, he might, in hindsight, have treated her differently. The charge was neither inappropriate nor cumulative.

7. The appellant also objected to the giving of the appellees' requested charge "that the law does not require that treatment given by a physician to a patient shall obtain nearly perfect, or perfect, results. The physician is not responsible in damages for a lack of success unless it is shown from the evidence that the doctor did not exercise the degree of care and skill ordinarily employed by the medical profession generally, under similar conditions and like surrounding circumstances." She argues that it was not adjusted to the evidence because character and honesty were not in issue; it was a negative statement of the standard of care; it invaded the province of the jury; it so tainted the entire charge that the jury was hopelessly prejudiced against her case; and it suggested that dishonest or fraudulent conduct on the part of a physician is necessary to prove medical negligence. Inasmuch as the same instruction was upheld against similar protests in *Hopper v. McCord*, 115 Ga. App. 10 (2) (153 SE2d 646) (1967), it is not susceptible to the objections made. Moreover, stating the negative often increases understanding of the positive.

8. Finally, the appellant enumerates as error the giving of the appellees' requested charge "that physicians do not guarantee the results of treatment or operation, and that in the absence of negligence on the part of the physicians, proof simply that an operation or treatment is different in its outcome from that expected or is followed by disastrous results instead of beneficial results neither establishes nor supports an inference of lack of proper care, skill or diligence on the part of the physicians." It is challenged as confusing and containing a lesser standard of care than that required by law, and as being prejudicial and argumentative because it states what negligence is not. The cases cited by the appellant are inapposite, whereas in *Hill v. Hosp. Auth.*, 137 Ga. App. 633, 639 (4) (224 SE2d 739) (1976), the identical instruction as to a defendant hospital was approved. The court characterized it as being "in accord with the general principles of negli-

gence law that the occurrence of an unfortunate event is not sufficient to authorize an inference of negligence. [Cits.]"

The court did not err in giving the charge.

*Judgment affirmed. Andrews, J., concurs. Birdsong, P. J., concurs specially.*

BIRDSONG, Presiding Judge, concurring specially.

I concur fully in Divisions 1, 2, 3, 5, 6, 7, and 8, and in the result reached by my colleagues as to Division 4. However, for the following independent reasons, I conclude that error was not committed when the trial court allowed the cross-examination of appellant's expert neurologist, regarding a medical article found in the Neurosurgery medical journal.

1. As a general rule, "[u]nder Georgia law, an expert witness can be cross-examined by reference to a standard treatise in the field of the expert's special knowledge, if the treatise has been proven to be a standard treatise on the subject, as was held in *Mize v. State*[, 240 Ga. 197, 198 (4) (240 SE2d 11)]. Also, the cross-examiner can establish the *authoritative* status of material used on cross-examination through the cross-examination of the witness, as was the case in *Pound v. Medney*[, 176 Ga. App. 756, 762 (4) (337 SE2d 772)]. [And w]hen establishing the *authoritativeness* of a text through the witness being cross-examined, the witness does not have to use the words 'standard' or 'authoritative.'" (Emphasis supplied.) (Agnor's Ga. Evidence, Opinion Evidence and Experts, § 9-6 (1991 Supp.)); otherwise the adverse expert witness could frequently thwart the use of the document in his cross-examination merely by refusing to so label it.

The foundation requirement for the use of a treatise in cross-examination is to establish the value of the particular document as a source of professional *authority* and, of course, a "standard" treatise is presumed to be *authoritative* or it could not achieve recognition as a "standard" source within its field. Moreover, notwithstanding *Pound v. Medney*, 176 Ga. App. 756 (337 SE2d 772), I believe that every article or theory contained within a recognized "standard" or "authoritative" treatise need not be individually authenticated, whether the expert limits his assessment to the selective scope of the one article or not, it being sufficient that the particular article or theory has been accepted for publication and professional dissemination under the imprimatur of the "standard" or "authoritative" treatise in which it appears.

It is well-recognized that the admission of evidence is a matter which rests largely within the sound discretion of the trial court. See generally *Gully v. Glover*, 190 Ga. App. 238 (4) (378 SE2d 411); *Gene Thompson Lumber Co. v. Davis Parmer Lumber Co.*, 189 Ga. App. 573, 575 (2) (377 SE2d 15). Of necessity, a trial court must be vested

with discretion to determine whether a particular treatise has adequately been established as "authoritative," to enable its use for purposes of cross-examination of the opposing party's expert witness. Therefore, *the correct standard of review in this case is whether the trial court abused his discretion* in allowing the cross-examination of appellant's expert regarding the article found in the medical publication concerned. See *Ruffin v. State*, 243 Ga. 95, 104 (16) (252 SE2d 472), cert. den. 444 U. S. 995 (100 SC 530, 62 LE2d 425). In my view, the trial court did not abuse its discretion.

I agree with my colleagues that " '[a] party can prove by cross-examination of an opposing party's expert that a treatise is standard [or authoritative] on the subject.' " *Pound v. Medney*, supra; Agnor, supra. Appellant's expert is a board certified neurologist who testified in "layman's terms" that neurology "is the diagnosis and treatment of diseases of the nervous system meaning the brain, the nerves coming from the brain, the spinal cord, nerves coming from the spinal cord, the muscles and associated trauma to the area," and that the only "difference between a neurologist and a neurosurgeon is that a neurosurgeon operates while a neurologist doesn't." Thereafter, the expert admitted in cross-examination that he was *familiar* with the journal called Neurosurgery, that it was *commonly read and referred to* by members of the neurosurgical profession or the medical profession with interest in the area, as a *useful reference and text*; that he was not a stranger to this periodical himself, although he was not familiar with the particular article in question; and that before being published, articles which appear in the journal are submitted to *peer review* before one or two reviewers "who will look at it on its own merit as to whether it was done *as a qualified or well-done study*." (Emphasis supplied.)

It is the duty of an appellate court to construe the evidence in support of the verdict and judgment (*Department of Transp. v. Hillside Motors*, 192 Ga. App. 637, 639 (2) (385 SE2d 746)), and this includes our obligation to draw those reasonable inferences from the competent testimony of record that either directly or indirectly supports the verdict and judgment rendered. When the testimony of the expert is viewed in this light, it is beyond cavil that, although the words "standard" or "authoritative" do not appear in the expert's description of the journal, his testimony unequivocally establishes the journal as an "authoritative" medical source. In this regard, it may reasonably be inferred that the journal is both an "authoritative" and "standard" medical treatise because it is "commonly read and referred to" by members of the neurosurgical profession or the medical profession with interest in this area," and these professionals consider it "a useful reference and text." Clearly, it would not be *commonly read* and certainly it would not be *commonly referred to* by such ex-

perts unless it was *authoritative.* Further, unless it was considered authoritative, it could not be deemed "a useful reference" and certainly not a useful "text" by such professionals and the expert witness himself. "Text" as the word is commonly used by the expert in his testimony unequivocally means a "textbook." See definition of "text" in Webster's Encyclopedic Unabridged Dictionary of the English Language (1989 ed.). And, a "textbook" in its common meaning is "a book used by students as a *standard work* for a particular branch of study." (Emphasis supplied.) Webster's, supra; compare Black's Law Dictionary (5th ed.) definition of "textbook." The primary common definition of "treatise" is "a book or writing that treats some particular subject." Webster's, supra. Also, a "treatise" is defined as "a formal and systematic exposition in writing of the principles of a subject, generally longer and more detailed than an essay." Id. When the expert's words are attributed their normal and common meaning, his testimony not only establishes this medical journal was *authoritative,* but that it was a standard medical treatise as well, being a useful "text."

Moreover, the use of the information contained in the article for purpose of cross-examination was not improper or prejudicial per se. Appellees were entitled to subject appellant's expert witness to a thorough and sifting cross-examination. OCGA § 24-9-64. And the detailed cross-examination of appellant's expert over the theory contained within this article served the legitimate purpose of testing the scope of the expert's knowledge in his field, particular in regard to the administration of Heparin to aneurysm patients after ruptures to enhance patient recovery. "It is a cardinal rule of evidence that if evidence is duly admissible under any legitimate theory, it should be admitted even though it does not qualify for admission under one or more other evidentiary theories." *Boatright v. State,* 192 Ga. App. 112, 116 (6) (385 SE2d 298) and cases cited therein. That is, "[e]vidence admissible in one capacity is not inadmissible because it does not satisfy the rules for admissibility in another capacity." *Stuckey Diamonds v. Jones,* 195 Ga. App. 351, 352 (393 SE2d 706). Therefore, the trial judge did not abuse his discretion in allowing the cross-examination of the expert regarding the article found in this medical journal.

2. Secondly, "[t]he object of all legal investigation is the discovery of truth. The rules of evidence are framed with a view to this prominent end, seeking always for pure sources and the highest evidence." OCGA § 24-1-2. In the case at bar, the expert witness admitted in open court that he was personally familiar with the medical journal in question and, in addition, that it was commonly read and referred to by professionals, as above discussed.

The existing law, regarding the cross-examination of expert wit-

nesses concerning professional writings, should be expanded in the interests of fundamental fairness. In my view, the rules should be immediately modified to authorize expressly the cross-examination of an expert regarding any *relevant* article found within a particular medical journal or writing *with which the expert claims to be or is otherwise shown to be personally familiar.* Such cross-examination is a probative means of testing the scope of the expert's medical knowledge and expertise in the professional area at issue to affect the expert's credibility and the weight to be given his testimony by the factfinder; *however, under this proposed rule, the contents of the article would not be admissible as substantive proof of the facts therein contained.*

The *personal familiarity* referred to in the proposed rule need not be a familiarity with the particular article, but only with the journal or writing in which the relevant article appears. This is because the mere fact that an expert is unfamiliar with a *relevant* medical article published in a professional journal or writing with which he is shown or professes to be familiar is of unquestionable relevance in testing the scope of the expert's professional knowledge and expertise concerning the particular professional matter then at issue. The scope of such examination should remain subject to the usual and legitimate discretionary control of the trial court. But in such instances, cross-examination should be permitted whether it is first established that the journal is an "authoritative" or "standard" treatise. OCGA §§ 24-2-1; 24-9-64.

This expansion of the use of medical writings in cross-examination is not unfair, as an expert certainly should be expected to exhibit some knowledge or opinion as to *relevant* information contained within medical journals, texts, or other writings with which he professes to be *personally familiar*, particularly as by merely professing familiarity with various professional writings an expert may enhance his credibility with the jury. Further, while the trial court has a duty "to protect a witness from being unfairly dealt with" on cross-examination, it also has a duty "to allow a searching and skillful test of his intelligence, memory, accuracy, and veracity" and qualifications where relevant. *Harris v. The Central R.*, 78 Ga. 525, 534 (3) (3 SE 355). "As a general rule, it is better that cross-examination should be too free than too much restricted." Id. However, any form of cross-examination should not be without necessary limits. Thus, the trial court should be able to limit the scope of cross-examination, regarding exploration of the expert's actual knowledge of the subject matter and degree of professional expertise, to relevant matters elicited by proper questioning. *Prince v. Kujawa*, 178 Ga. App. 828, 830 (2) (344 SE2d 680). This proposal is not novel, as Georgia has long favored the admission of any relevant evidence no matter how slight its probative

value. *Whisnant v. State*, 178 Ga. App. 742 (1) (344 SE2d 536). Further, this procedure presents no fair risk of fundamental unfairness, as the scope and tone of the examination remains under the discretionary control of the trial court, the opposing party may timely request limiting instructions, and the expert remains free to express his views, as was done in this case, regarding the basic reliability of the articles appearing in such publications. Of course, it should *not* be allowed to cross-examine an expert over professional writings which are *not* "authoritative" or "standard" when his personal familiarity therewith has *not* been established, as in such instances his credibility has *not* been tacitly enhanced by his response, and the fair risk of prejudice would appear to exceed substantially the probative value to be gained by such cross-examination.

Accordingly, I would both affirm the judgment and expand the existing rule regarding cross-examination of experts over the contents of medical writings, as above outlined.

DECIDED APRIL 8, 1992 —
RECONSIDERATION DENIED JULY 10, 1992.

*Thomas L. Murphy*, for appellant.
*Alston & Bird, Judson Graves, Kenneth B. Pollock*, for appellees.

