A02A1104. BYRD v. MEDICAL CENTER OF CENTRAL GEORGIA,
INC. et al.
(574 SE2d 326)

ELLINGTON, Judge.

In this medical malpractice case, plaintiff George Byrd, individually and as administrator of the estate of decedent Sandra Byrd ("Byrd"), appeals from the judgment on a jury verdict in favor of the Medical Center of Central Georgia, Inc. ("MCCG"), attending physician Norman Buka, M.D., and OB/GYN resident Sandra Mager, M.D. Byrd challenges the trial court's decision to exclude certain evidence regarding the applicable standard of care; contends the trial court erred in instructing the jury; and claims that certain jurors should have been excused for cause. Because we find the trial court erred in excluding the evidence and in charging the jury, we reverse.

The following facts are undisputed: Sandra Byrd was a 53-year-old, slightly overweight woman who was treated at the Family Health Center of MCCG for a benign cervical mass. On February 6, 1996, MCCG physicians performed a total abdominal hysterectomy and bilateral salpingo-oophorectomy. During surgery, Byrd was under general anesthesia for two and one-half hours. She did not receive any prophylactic care for the prevention of deep vein thrombosis. She was discharged on February 9, 1996. Two days later, Byrd arrived at the MCCG emergency room complaining of shortness of breath. While she was being examined by physicians, Byrd experienced cardiopulmonary arrest. She could not be resuscitated and died shortly thereafter. An autopsy confirmed that her cardiopulmonary arrest was secondary to bilateral pulmonary thromboemboli, blood clots in both lungs resulting from deep vein thrombosis (hereinafter "DVT").

The plaintiff filed a medical malpractice suit, alleging that the defendants failed to follow the standard of care in the medical profession generally in failing to use specific prophylactic procedures to keep Byrd from developing DVT. He contended that the defendants failed to properly evaluate Byrd for her risk of developing DVT; that Byrd was, in fact, at an increased risk of developing DVT; and that the physicians failed to provide any prophylactic treatment to pre-

vent DVT, such as the pre-operative administration of heparin or the use of either sequential compression boots or anti-embolic stockings.

At trial, the plaintiff's experts testified that the defendants failed to properly evaluate Byrd before surgery and failed to identify her as being at moderate risk for developing DVT, given that she was 53 years old, moderately obese, and having major abdominal surgery lasting more than 30 minutes. They testified that, based upon "hundreds" of research studies and "a huge amount of literature," leading authorities such as the National Institutes of Health, the Mayo Clinic, and the American College of Obstetricians and Gynecologists had concluded that physicians should attempt to prevent DVT in patients like Byrd by administering heparin in low doses or by using sequential compression boots. The experts testified that this was the standard of care which the defendants violated when treating Byrd. They also testified that, within a reasonable degree of medical certainty, the defendants' failure to properly assess Byrd for DVT risk factors and to provide necessary prophylactic care caused her death.

The defendants testified that they evaluated Byrd's risk for DVT, determined she was at low risk, and decided she did not require prophylactic measures other than early ambulation following surgery. The defendants' experts testified that this approach was within the standard of care for low-risk patients. When cross-examined about the authorities cited by the plaintiff, the defendants and their experts testified that they did not agree with those authorities regarding the use of prophylactic measures on patients with moderate risk of DVT. One expert specifically testified that "most of the doctors in our area" were not providing DVT prophylactic care routinely, while another stated that physicians in Georgia and "the majority of practicing physicians in the United States" were not providing DVT prophylactic care for patients like Byrd in 1996. Following a defense verdict, the plaintiff appeals.

1. The plaintiff contends the trial court erred in excluding from evidence the service manual used by the surgical department of MCCG. He argues the manual was directly relevant to the jury's determination of the primary issue in this medical malpractice case, to wit: whether the defendants negligently failed to follow the standard of care prevailing in the medical profession generally under the same or similar circumstances. We agree and reverse.

Evidence is relevant if it "logically tends to prove or disprove any material fact which is at issue in the case, and every act or circumstance serving to elucidate or throw light upon a material issue or issues is relevant." (Citation and punctuation omitted.) *Cornelius v. Macon-Bibb County Hosp. Auth.*, 243 Ga. App. 480, 487 (5) (533 SE2d 420) (2000). See also *Luckie v. Piggly-Wiggly Southern*, 173 Ga. App. 177, 178 (1) (325 SE2d 844) (1984) (any evidence which is illustrative

of what constitutes ordinary care is relevant and admissible for whatever weight the jury wishes to assign to it). "[T]he Georgia rule favors the admission of any relevant evidence, no matter how slight its probative value. Evidence of doubtful relevancy or competency should be admitted and its weight left to the jurors." (Citation omitted.) *Cornelius v. Macon-Bibb County Hosp. Auth.*, 243 Ga. App. at 487 (5); *Wadkins v. Smallwood*, 243 Ga. App. 134, 137-138 (2) (530 SE2d 498) (2000). "But the trial judge may exercise discretion in excluding relevant evidence upon a determination that its probative value is substantially outweighed by the risk that its admission will create a substantial danger of undue prejudice or of misleading the jury." (Citations and punctuation omitted.) *Cornelius v. Macon-Bibb County Hosp. Auth.*, 243 Ga. App. at 487 (5).

The service manual at issue outlined the general responsibilities for surgeons at MCCG and detailed specific procedures to be performed before, during, and after surgery. The manual provided, in relevant part, as follows:

> 25. Deep Vein Thrombosis Prophylaxis. As a general rule, *all patients undergoing general anesthesia should be [sic] have some form of DVT prophylaxis. Rather than waiting for an indication to use DVT prophylaxis, it would be better to provide this prophylaxis as a standard procedure, unless justification can be made for not using any protection.* . . . The preferred method of DVT prophylaxis is knee high or thigh high sequential compression devices (SCD). They should be maintained until the patient is ambulatory. However, do not allow a patient to become bed-bound merely because a SCD is being used. Subcutaneous Heparin can be used in addition to a SCD if there is a high-risk of DVT.

(Emphasis supplied.)

The defendants filed a motion in limine to exclude the manual as irrelevant, arguing that the manual applied only to MCCG's surgical department, not OB/GYN personnel, even if they also perform surgery. Without reading the manual, the trial court excluded it from evidence, finding that the defendants were not actually aware of the manual. It also stated that it was unsure whether the standard of care for general surgery should be the standard for other specialties.

The determination of the standard of care applicable to the defendants, as OB/GYNs performing major abdominal surgery, was the primary question in this trial. In a medical malpractice case, the standard of care is defined as that which *physicians in general* should follow *under the same or similar circumstances*. OCGA § 51-1-27; *Johnson v. Riverdale Anesthesia Assoc.*, 275 Ga. 240, 241 (1)

(563 SE2d 431) (2002); *McDaniel v. Hendrix*, 260 Ga. 857, 859 (1) (401 SE2d 260) (1991). The excluded manual established that the MCCG surgery staff had recognized and adopted a guideline which strongly recommended prophylactic care to prevent DVT *for all surgical patients undergoing general anesthesia*, unless there was a reason to forgo such treatment. This is clearly relevant to the jury's determination of the standard of care to be applied in this case. The evidence also directly countered the defendants' contention that physicians in Georgia as well as nationally were not using the prophylactic measures advocated by the plaintiff's experts.

Further, the defendants cannot legitimately argue that the evidence of recommended procedures for surgery at MCCG somehow had no significance to them simply because they were OB/GYNs, not general surgeons. Expert witnesses for both parties repeatedly blurred the lines between standards for abdominal surgery performed by surgeons and by OB/GYNs, often making no distinction at all. This is understandable, since the defendants in this case performed major gynecological surgery. As one of the plaintiff's experts testified, gynecological surgery cannot be separated out from other abdominal surgeries. "This is surgery. If you cut somebody open . . . and you remove a piece of their bowel or you remove their uterus or you take out their appendix, you're doing surgery in somebody's abdomen. The laws of . . . bleeding and clotting apply across the board. This is not unique to gynecology." Another of the plaintiff's experts specifically testified that abdominal surgery patients, whether they are being treated for gallbladder, colon, gynecological, or similar abdominal problems, "fall into the same group" when it comes to DVT prophylactic care. The transcript also shows that the defendants relied in large part upon a surgical reference book from Duke University's Department of Surgery that supported their position on prophylactic care.

As to whether the trial court abused its discretion in excluding this relevant evidence, the trial court missed the point when it stated that it might be "unfair" to admit the manual because the defendants did not know about its existence. The manual demonstrates that other physicians at MCCG were providing prophylactic care under the same or similar circumstances as those presented in Byrd's case. As noted above, this directly contradicts the defendants' testimony that physicians in Georgia were not providing such care. In addition, this evidence speaks to the issue of the defendants' negligence, in other words, whether, as physicians performing surgery, they *should* have been aware of procedural guidelines adopted by MCCG's surgical department.

Having reviewed the entire record, we find that MCCG's surgical service manual was relevant to a disputed material issue at trial.

The trial court erred in finding otherwise and abused its discretion in excluding the evidence from trial. See *Cornelius v. Macon-Bibb County Hosp. Auth.*, 243 Ga. App. at 487 (5). Therefore, we reverse.

We now reach only those issues that may recur upon retrial.

2. Byrd challenges the trial court's jury instruction on the standard of care, complaining that the charge was not legally accurate and was not adjusted to the evidence; that it was misleading and confusing to the jury; that it conflicted with the pattern charges; and that it constituted a commentary on the evidence. The record shows that, after the charge conference and just before closing arguments, the trial court expressed concern that the jury may be confused about the standard of care applicable to this case because the parties' experts had given substantial conflicting testimony about the standard. Although such conflicting testimony is not unusual in a medical malpractice case, the trial court sua sponte drafted the following charge:

> When we state that doctors must perform within the standard of care, what we mean is that doctors must act within the range of generally acceptable care. The range of generally acceptable care may or may not include different ways of treating a particular patient. *We in the law are not properly trained or experienced to settle legitimate disputes within the medical ranks about which of two legitimate competing theories of treatment a doctor should use. Such resolution will have to be decided by good doctors experimenting and testing and researching and sharing notes with each other.* Our use of the term standard of care does not intend to imply that there is only one acceptable way for doctors to treat patients in this way or any other situation. We use the term standard to rule out the use of care that is unacceptable generally in medical practice. . . . Your job is to decide whether the care given was within the standard. *You're not being charged with setting the standard as being one versus the other if there are two or more medical decisions both within the standard.*

(Emphasis supplied.) The trial court admitted that the charge itself may confuse some of the jurors. Even so, the trial court gave the charge over the plaintiff's timely objections. The trial court also gave the pattern jury charge on the standard of care. See Suggested Pattern Jury Instructions, Vol. I: Civil Cases, pp. 251-252 (3rd ed. 1991).

We disapprove of the challenged instruction in this case. It is axiomatic that jury charges must embody a correct, applicable, and complete statement of law that is adjusted to the evidence. See *Wadkins*

*v. Smallwood*, 243 Ga. App. at 139 (5). A charge "must not be argumentative or seek an expression of opinion on the part of the court; and it must not be so phrased so as to have the tendency to confuse and mislead the jury or to becloud the issues in the case." (Footnote omitted.) *Id.* It is reversible error for the trial court, during trial or in its jury charge, to express or intimate its opinion as to what the evidence has or has not proven. OCGA § 9-10-7.

Not only was the instruction at issue inherently confusing, it clearly undermined the jury's role as the sole arbiter in determining the proper standard of care to be applied in this case, based upon the preponderance of the evidence presented by both parties' expert witnesses. See *Francis v. Reynolds*, 215 Ga. App. 418 (450 SE2d 876) (1994). The instruction implied that the trial court had concluded that the conflicting standards espoused by the experts were both "legitimate." But the jury could have rejected one or both of the competing standards proposed by the experts. As in any jury trial, "[t]he jury was entirely free to reject the testimony of any of appellees' experts, or to reject the testimony of any of appellants' experts, or to reject the testimony of *all* of the experts." (Citation omitted; emphasis in original.) *Packer v. Gill*, 193 Ga. App. 388, 389 (2) (388 SE2d 338) (1989). Once the plaintiff presented competent expert testimony to support his malpractice case, as in this case, the jury alone was responsible for deciding the weight to be given all the testimony presented, whether the preponderance of the evidence demonstrated a certain standard of care prevailed among physicians generally, and whether the defendants breached the standard. See id. For these reasons, the trial court erred in giving the challenged jury instruction, and it should not be given during the retrial of this case.

3. Byrd contends the trial court erred in charging the jury on hindsight, arguing that there was no evidence to support the charge. The trial court gave the following instruction:

In a medical malpractice action, a defendant cannot be found negligent on the basis of an assessment of a patient's condition which only later in hindsight proves to be incorrect so long as the initial assessment was made in accordance with reasonable standards of medical care. In other words, the concept of negligence does not include hindsight. Negligence consists of not foreseeing and guarding against that which is probable and likely to happen, not against that which is only remotely and slightly possible.

"The hindsight charge is appropriate in a medical malpractice case where the evidence raises an issue as to whether the negligence claim is premised on *later acquired knowledge* or information *not*

*known or reasonably available* to the defendant physician at the time he provided the medical care." (Citations omitted; emphasis supplied.) *McNabb v. Landis*, 223 Ga. App. 894, 895 (1) (479 SE2d 194) (1996). Cf. *McCoy v. Alvista Care Home*, 194 Ga. App. 599, 601 (391 SE2d 419) (1990) (hindsight charge not appropriate when malpractice claim based upon defendant's prior knowledge of the risk that a senile patient would wander outside if left unsupervised and unrestrained). In this case, it is undisputed that the defendants were aware of Byrd's age, weight, and other relevant risk factors for DVT and that extensive literature existed that recommended the use of specific measures to prevent DVT in abdominal surgery patients in Byrd's condition. In fact, the defendants do not claim that they were unaware of Byrd's condition or the availability of procedures to prevent DVT before surgery, but assert that they treated her appropriately under the circumstances. There was no evidence presented that the defendants only became aware of the recommendations or Byrd's risk factors *after* surgery. Cf. *Brannen v. Prince*, 204 Ga. App. 866, 870-871 (6) (421 SE2d 76) (1992) (physicians did not have access to patient's medical history until after he had administered a drug which caused a severe brain hemorrhage); *Haynes v. Hoffman*, 164 Ga. App. 236, 238 (3) (296 SE2d 216) (1982) (patient failed to disclose her history of allergies before physician administered a drug which caused a severe reaction).

Therefore, hindsight, based on information that only became available later, was not an issue in this case. "A charge which injects issues into a case not supported by the evidence tends to confuse a jury as to the true issues." (Citation omitted.) *McNabb v. Landis*, 223 Ga. App. at 895 (1). Accordingly, given the evidence presented in this trial, the trial court erred in charging the jury on hindsight.

4. We find that the trial court did not abuse its discretion in refusing to allow the plaintiff to introduce evidence about an unrelated professional disciplinary action taken against Dr. Buka in 1982 for improper billing practices regarding Medicaid patients. See *Reese v. State*, 241 Ga. App. 350, 353 (5) (526 SE2d 867) (1999) (trial court did not abuse its discretion in limiting cross-examination of witness on prior unrelated disciplinary action).

5. Pursuant to our reversal of this case, we find that Byrd's remaining allegations are moot and unlikely to occur at retrial.

*Judgment reversed. Smith, P. J., and Eldridge, J., concur.*

DECIDED OCTOBER 9, 2002 —
RECONSIDERATION DENIED NOVEMBER 7, 2002

*Charles L. Ruffin, Mark L. Stuckey*, for appellant.