**FOURTH DIVISION
DILLARD, P. J.,
BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**August 2, 2024**

# In the Court of Appeals of Georgia

A24A0749. KATHY BOONE et al v. VASCULAR SURGICAL ASSOCIATES, P.C., et al.

DILLARD, Presiding Judge.

Paula Thacker suffered debilitating injuries and ultimately died following medical treatment for a series of small strokes. Thereafter, Kathy Boone—Paula's daughter—filed a medical-malpractice suit against numerous individuals and companies, including Vascular Surgical Associates, Northwest Neurology, P.C., Dr. Sandy McGaffigan, Dr. Arun Chervu, and Dr. Gary Jacobson.[1] The case proceeded to a jury trial, after which a verdict was entered in favor of the appellees. Boone appeals, arguing the trial court erred by (1) permitting an unqualified defense expert

---

[1] Vascular Surgical Associates will referred to as "VSA" throughout this opinion, and VSA, Northwest Neurology, P.C., Dr. Sandy McGaffigan, Dr. Arun Chervu, and Dr. Gary Jacobson will be collectively referred to as "the appellees."

to testify, and (2) giving "no-guarantee" and "differing-views" jury instructions. For the following reasons, we affirm.[2]

Viewing the evidence in the light most favorable to the jury's verdict,[3] the record shows that, in 2016, Thacker was diagnosed with carotid artery disease in her left and right carotid arteries. Generally, the symptoms of the disease are "some sort of stroke-like event that could be related to those carotids[,]" but at the time she was diagnosed, Thacker was asymptomatic. Nevertheless, as a preventative measure, Thacker was prescribed aspirin and a high-dose statin medication.

On March 25, 2018, Thacker began feeling numbness on the right side of her face, and Boone took her to Wellstar Paulding Hospital. Once they arrived, Thacker was evaluated by a doctor who determined she had suffered a series of "small

---

[2] Oral argument was held on May 1, 2024, and is archived on this Court's website. *See* Court of Appeals of the State of Georgia, Oral Argument, Case No. A24A0749 (May 1, 2024), available at https://vimeo.com/942076478. Of note, two appellee briefs were submitted in this case, one by VSA, Dr. Chervu, and Dr. Jacobson, and another by Northwest Neurology and Sandy McGaffigan.

[3] *See Amu v. Barnes*, 286 Ga. App. 725, 725 (650 SE2d 288) (2007) ("[When] a jury returns a verdict, the same must be affirmed on appeal if there is any evidence to support it, and the evidence is to be construed in a light most favorable to the prevailing party with every presumption and inference in favor of sustaining the verdict." (punctuation omitted)).

strokes[,]"which can cause damage to parts of the brain. As a result, on March 26, 2018, she was transferred to Cobb Hospital for a vascular consult. Later that day, Thacker was seen by Dr. McGaffigan, a neurologist, as well as other physicians—including a cardiologist and a vascular surgeon. Following these evaluations, Thacker was diagnosed with "crescendo TIAs," which is a "situation where a patient is having multiple events more and more often." Thacker was then placed on an "IV or intravenous heparin infusion drip." And that night, even though Thacker was taking heparin, aspirin, and was receiving IV fluids, she suffered an episode of right facial drooping, numbness in her right hand, and had difficulty speaking.

Initially, Dr. Jeffrey Winter—a vascular surgeon—scheduled Thacker to undergo a carotid endarterectomy.[4] But the next day, on March 27, 2018, Dr. Chervu—another vascular surgeon—evaluated Thacker and determined that, instead, she needed to have a transcarotid artery revascularization ("TCAR") procedure, which is a technique by which a metal stent is placed in the patient's carotid artery.

---

[4] Carotid endarterectomy is "a procedure to treat carotid artery disease." *Mayo Clinic*, https://www.mayoclinic.org/tests-procedures/carotid-endarterectomy/about/pac-20393379 (Last visited July 30, 2024).

And the next morning, on March 28, 2018, Chervu performed the TCAR procedure. Relevant here, Chervu admitted that he deviated from his medical training by waiting to administer Plavix[5] to Thacker until approximately three hours *after* the procedure, rather than beforehand. And in the context of this case, this practice involved combining aspirin and Plavix, and is referred to as dual-antiplatelet therapy ("DAPT").[6] Chervu did not administer this therapy to Thacker prior to surgery because he was concerned about combining these medications due to the heightened risk of bleeding.

Shortly after the procedure, Dr. Chervu told Boone he was concerned Thacker might have experienced a new stroke because her blood pressure repeatedly spiked during surgery. But the doctors who assessed Thacker that afternoon concluded she had not suffered a new stroke. Additionally, Chervu asked Dr. McGaffigan for help

---

[5] Plavix is "used alone or together with aspirin to lessen the chance of a heart attack or stroke." *Mayo Clinic*, https://www.mayoclinic.org/drugs-supplements/clopidogrel-oral-route/description/drg-20063146 (Last visited July 30, 2024).

[6] Dual antiplatelet therapy "with aspirin and oral P2Y inhibitors remains the cornerstone of therapy for patients with acute coronary syndrome (ACS)." *Mayo Clinic*, https://www.mayoclinicproceedings.org/article/S0025-6196(22)00127-6/fulltext (Last visited July 30, 2024) (footnote omitted).

evaluating Thacker because she was a neurologist; and after doing so, she likewise did not believe Thacker had suffered another stroke. Thacker's condition improved throughout the day, and when Chervu evaluated her at 6:30 p.m., she was more alert, her speech had improved, and she had increased range of motion in her right arm.

Nevertheless, Thacker's condition worsened over the next several hours, and by 8:00 p.m., the nurse on duty found her unresponsive. The nurse immediately performed an "NIH Stroke Scale assessment," which required him to assign a score to various categories of symptoms. Thacker's total score indicated that she had suffered a "severe stroke." The nurse also calculated a "Glasgow Coma Score," and found that Thacker's score had fallen from 15 to 10, which suggested she was experiencing neurological problems. Then, around 8:55 p.m., the nurse called Dr. Jacobson—who was the vascular surgeon on call—to tell him about the situation. But according to Jacobson, during the call, he was not informed of the scores Thacker received on the foregoing scales or anything else suggesting the stent implanted in her artery was blocked. After Thacker was released from the hospital, her symptoms got "worse and worse over time"; and tragically, she passed away.

Thereafter, on December 19, 2018, Thacker—by and through her next friend, Boone—filed a malpractice suit against VSA, Dr. Chervu, and Dr. Jacobson.[7] Boone later amended her complaint to include medical-malpractice claims against Northwest Neurology and Dr. McGaffigan.[8] On February 11, 2022, Boone filed a second amended complaint "in anticipation of the upcoming trial . . . ." Relevant here, Boone alleged that Chervu was negligent in failing to administer DAPT to Thacker prior to the TCAR procedure. Following protracted discovery, the case proceeded to trial, and the jury rendered a verdict in favor of the appellees. Boone filed a motion for a new trial, raising, *inter alia*, the same arguments she does now on appeal; but following a hearing on the matter, the trial court denied it. This appeal by Boone follows.

---

[7] Despite the voluminous 4,465 page record, none of the parties provide a description, along with record citations, of the procedural history underlying this appeal. And Boone's failure to do so is in violation of our rules. *See* CT. APP. R. 25 (a) (5) (requiring an appellant, in her brief, "to describe[ ] the relevant proceedings below . . . with appropriate citations to the record). Needless to say, this Court will not "cull the record on behalf of a party, particularly in a case such as this where the record is voluminous." *Callaway v. Willard*, 351 Ga. App. 1, 5 (1) (830 SE2d 464) (2019) (punctuation omitted). So, while it appears our independent review of the record has likely identified the relevant procedural history, "if we have missed something in the record . . . the responsibility rests with appellant['s] counsel." *Pneumo Abex, LLC v. Long*, 357 Ga. App. 17, 18 n.3 (849 SE2d 746) (2020) (punctuation omitted).

[8] Boone also named defendants who are not parties to this appeal. All of the appellees filed responses to each of Boone's pleadings.

When a jury returns a verdict, it must be affirmed on appeal "if there is any evidence to support it, and the evidence is to be construed in a light most favorable to the prevailing party with every presumption and inference in favor of sustaining the verdict."[9] Put another way, a jury verdict, "after approval by the trial court, and the judgment thereon will not be disturbed on appeal if supported by any evidence, in the absence of any material error of law."[10] And we review a denial of a motion for a new trial "according to this same standard."[11] With this deferential standard of review in mind, we turn now to Boone's specific arguments.

1. Boone first argues the trial court erred in allowing Dr. Karen Quirk—a vascular surgeon and defense expert—to testify as to the standard of care for

---

[9] *Yash Sols., LLC v. New York Glob. Consultants Corp.*, 352 Ga. App. 127, 132 (1) (834 SE2d 126) (2019) (punctuation omitted); *accord Green v. Key Custom Homes, Inc.*, 302 Ga. App. 800, 802 (1) (692 SE2d 56) (2010).

[10] *Yash Sols., LLC*, 352 Ga. App. at 132 (1) (punctuation omitted); *accord Green*, 302 Ga. App. at 802-03 (1).

[11] *Yash Sols., LLC*, 352 Ga. App. at 132 (1) (punctuation omitted); *accord Green*, 302 Ga. App. at 802 (1).

administering medicine for patients prior to a TCAR procedure because she was unqualified to do so.[12] We disagree.

OCGA § 24-7-702 ("Rule 702") concerns the "admissibility of opinion testimony by expert witnesses in civil cases."[13] And the usual standard for the admissibility of such testimony is "found in Rule 702 (b) . . . ."[14] The version of Rule 702 (b) applicable in this case provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and

---

[12] Dr. Quirk's testimony had no bearing on Boone's negligence claims against Dr. McGaffigan. As explained *infra*, Quirk testified about the standard of care for medicating a patient prior to a TCAR procedure, and McGaffigan was not involved in any decisions regarding Thacker's medication.

[13] *Dubois v. Brantley*, 297 Ga. 575, 580 (2) (775 SE2d 512) (2015).

[14] *Id.*

(3) The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.[15]

Importantly, the issue of the admissibility or exclusion of expert testimony "rests in the broad discretion of the court, and consequently, the trial court's ruling thereon cannot be reversed absent an abuse of discretion."[16] Indeed, the Supreme Court of Georgia has explained that "[t]he whole premise of Rule 702 is that a trial court must act as a 'gatekeeper' to ensure the relevance and reliability of expert testimony."[17] Nevertheless, our Supreme Court has held that "disputes as to an expert's credentials are properly explored through cross-examination at trial and go to the weight and credibility of the testimony, not its admissibility."[18]

---

[15] Former OCGA § 24-7-702 (2022) (effective from January 1, 2013 to June 30, 2022). The trial underlying this case occurred in early May 2022.

[16] *Cleveland v. Sentinel Ins. Co., Ltd.*, 354 Ga. App. 795, 796-97 (1) (a) (840 SE2d 738) (2020) (punctuation omitted); *accord Agri-Cycle LLC v. Couch*, 284 Ga. 90, 93 (5) (663 SE2d 175) (2008).

[17] *Dubois*, 297 Ga. at 585 (2); *see Howell v. Cochran*, 365 Ga. App. 80, 84 (a) (877 SE2d 625) (2022) ("Under Rule 702, it is the role of the trial court to act as a gatekeeper of expert testimony." (punctuation omitted)).

[18] *Agri-Cycle LLC*, 284 Ga. at 93 (5) (punctuation omitted); *accord Savannah Cemetery Grp., Inc. v. DePue-Wilbert Vault Co.*, 307 Ga. App. 206, 211 (3) (704 SE2d

Turning to the instant case, Boone argues that Dr. Quirk was not qualified to testify as to the standard of care applicable to medicating a patient prior to a TCAR procedure. And Boone correctly notes that, at the time of trial, Quirk had only performed eight or nine TCAR procedures, all of which took place after Boone's 2018 TCAR. Undoubtedly, the easiest way to demonstrate that an expert "has an appropriate level of knowledge in performing a procedure or teaching others how to perform a procedure is by proof that the expert actually has done these things . . . ."[19] But our Supreme Court has explained that Rule 702 "do[es] *not* require that an expert actually have performed or taught the very procedure at issue" to be qualified to testify.[20]

And here, prior to trial, Boone filed a motion to exclude "certain opinions of Karen Quirk, M. D.[,]" contending that she was not qualified to testify regarding the

---

858) (2010).

[19] *Dubois*, 297 Ga. at 585 (2) (punctuation omitted); *accord Mekoya v. Clancy*, 360 Ga. App. 452, 459 (1) (861 SE2d 409) (2021).

[20] *Dubois*, 297 Ga. at 584 (2) (punctuation omitted) (emphasis supplied); *see Mekoya*, 360 Ga. App. at 459 (1). "[B]y the plain terms of [Rule 702], the pertinent question is whether an expert has an appropriate level of knowledge in performing the procedure or teaching others how to perform the procedure, not whether the expert himself has actually performed or taught it." *Id.* (punctuation omitted)).

standard of care for medicating patients prior to a TCAR procedure. But the trial court denied the motion shortly thereafter. In doing so, the trial court expressed concern that Quirk might not be as knowledgeable or experienced as plaintiff's experts, but it nevertheless found she was qualified to testify as to the administration of medicine prior to a vascular or arterial procedure. The court further noted that the jury would decide which of the experts they found *more* experienced and knowledgeable.

At trial, Boone reasserted her objection to Dr. Quirk testifying to the standard of care for the administration of medicine prior to the procedure at issue. And during the discussion of the issue, the trial court stated the following:

> I think it really goes— I don't remember what was asked of her, but—I mean it goes to *a fact question for the jury of whether or not she is qualified.* It appeared that she is and to what extent there [may be] testimony from other people who performed more of these [TCAR procedures], [the jurors] can certainly consider that. So that's just part of the jury's job.[21]

Suffice it to say, the trial court misstated the law in asserting that it is the province of the jury to determine whether an expert is *qualified to testify*. Indeed, whether an

---

[21] (Emphasis supplied).

expert is qualified to testify on a particular subject is within the trial court's discretion, and the *court* serves as the gatekeeper in making such a decision.[22] But on appeal, an appellant must show harm as well as error;[23] and in this case, the trial court made it clear both before *and* after trial, that it had independently made the determination that Dr. Quirk was qualified and it was for the jury to determine which experts were *more* knowledgeable and experienced.[24]

---

[22] *See supra* notes 16-17 & accompanying text.

[23] *See Madison v. State*, 281 Ga. 640, 642 (2) (b) (641 SE2d 789) (2007) ("[H]arm as well as error must be shown to authorize a reversal by this [C]ourt. When a plaintiff in error brings a case here, he must show error which has hurt him. This court is not an expounder of theoretical law, but it administers practical law, and corrects only such errors as have practically wronged the complaining party." (punctuation omitted)); *accord Isbell v. Credit Nation Lending Serv., LLC*, 319 Ga. App. 19, 22 (735 SE2d 46) (2012). Significantly, Dr. Chervu *admitted* that he deviated from the applicable standard of care by failing to give Thacker dual-platelet therapy.

[24] In denying Boone's pre-trial motion to exclude Dr. Quirk's testimony, the trial court found Quirk was qualified to testify regarding the standard of care for administering medicine to patients prior to TCAR surgery and that the jury would decide which of the experts they found more experienced and knowledgeable. And again, in denying Boone's motion for a new trial, the court noted that Boone's argument that it shifted the duty to determine whether Quirk was qualified was "incorrect and taken out of context." So, despite the trial court's statements regarding the jury at trial, the court made clear that it made the qualification decision.

Turning to Dr. Quirk's qualifications,[25] she—like Dr. Chervu— is a vascular surgeon,[26] and is board certified in general and vascular surgery. Furthermore, while Quirk had not performed any TCAR procedures at the time of Thacker's surgery, her practice is one hundred percent vascular surgery. She is also experienced in treating carotid artery disease, seeing approximately 15 patients a month during her eight-year residency and around 10 patients per month since the conclusion of her training. And throughout her career, Quirk regularly treated patients who take anti-platelet medication—the type of medication at issue in this case—for purposes of stroke risk reduction. So, Quirk is familiar with the risks of this medicine, including hemorrhaging or bleeding.

---

[25] Boone complains that Dr. Quirk's trial testimony regarding her qualifications was inconsistent with her deposition testimony during discovery. But to the extent Quirk's testimony was inconsistent in this regard, it was within the trial court's broad discretion to determine which testimony was credible. *See Dabdoub v. Glob. Home Image*, *LLC*, 291 Ga. App. 298, 299 (661 SE2d 669) (2008) (noting that, when the trial court is the fact finder, "[t]he trial court—not this Court—resolves issues of witness credibility, and conflicting evidence in the record . . . .").

[26] In its order denying Boone's motion for a new trial, the trial court stated that Dr. Quirk was not a vascular surgeon, but it is undisputed throughout the record and the parties' briefs that she was indeed a vascular surgeon.

Dr. Quirk testified that she performed over 200 surgeries involving carotid artery disease during her training under supervision and between 160 and 180 surgeries following that training. Significantly, a TCAR procedure involves endovascular stenting, and Quirk regularly performs endovascular stenting procedures. And according to Quirk, she is experienced in making decisions about medications for patients who are about to have surgery for carotid artery disease to minimize the risk of a stroke or blood clot.

Relevant here, Dr. Quirk testified she was familiar with Dr. Chervu's concerns about administering DAPT to Thacker prior to surgery. And in this case, DAPT would only have entailed adding Plavix to the medications Thacker was already taking. Quirk believed it was reasonable under the applicable standard of care for a surgeon to be concerned about adding Plavix to those medications. But Quirk testified that another, safer way to administer DAPT would have been to substitute Plavix for heparin. Nevertheless, Quirk believed Chervu's "plan was in compliance with the medical standard of care." And Quirk acknowledged that DAPT was the usual treatment for TCAR patients, but she testified there are always exceptions to "the rule in medicine."

Given the foregoing, although Dr. Quirk had not performed a TCAR procedure before 2018, she was a long-time vascular surgeon experienced in performing the same *type* of procedure—*i.e.*, procedures involving endovascular stenting—on patients who, like Thacker, were diagnosed with carotid artery disease. She also regularly managed the medication administered to those patients. Again, under Georgia law, to be qualified as a medical expert, the expert is not required to have performed or taught the exact surgery as the one at issue.[27] And significantly, as to the impact of Quirk's testimony, although Dr. Chervu explained his reasons for doing so, he *admitted* to deviating from the applicable standard of care in his treatment of Thacker. Simply put, given the foregoing, we cannot say the trial court abused its discretion in qualifying Quirk as an expert to testify as to the applicable standard of care when medicating patients prior to TCAR procedures.[28]

---

[27] *See supra* note 20 & accompanying text.

[28] *See Robles v. Yugueros*, 343 Ga. App. 377, 384-85 (2) (a) (807 SE2d 110) (2017) ("Given [the expert's] medical background and experience, which included reading the exact type of x-ray at issue here—and doing so in collaboration with emergency medicine physicians, the trial court did not abuse its discretion in rejecting [the appellant's] contention that, because [the expert] was a radiologist who had never practiced emergency medicine, he was not qualified under OCGA § 24-7-702 . . . to render opinions regarding [a doctor's] interpretation of [the appellant's wife's abdominal x-ray]."); *Graham v. Reynolds*, 343 Ga. App. 274, 278-79 (2) (a)-(b) (807

2. Next, Boone contends the trial court gave two non-pattern jury instructions that improperly placed "a thumb on the scale" in favor of the appellees.[29] Again, we disagree.

We review *de novo* an allegedly erroneous jury instruction, which is "a legal question."[30] And in assessing the assertion that a jury instruction was erroneous, it

---

SE2d 39) (2017) (holding that a doctor was competent to testify as an expert regarding the standard of care applicable to a doctor in another specialty when the expert had the requisite knowledge and experience under Rule 702 to give expert testimony regarding the acts or omissions of a doctor in another specialty); *Cotten v. Phillips*, 280 Ga. App. 280, 282-83 (633 SE2d 655) (2006) (holding that trial court did not abuse discretion in finding that vascular surgeon was qualified to testify as to orthopedic surgeon's failure to properly assess, monitor, and respond to patient's vascular condition during orthopedic treatment and surgery).

[29] Trial courts are not legally bound to use the exact language in Georgia's suggested pattern jury instructions when charging a jury. *See Bailey v. Edmundson*, 280 Ga. 528, 534 (7) (630 SE2d 396) (2006), *superseded by statute on other grounds as acknowledged by Chrysler Grp., LLC v. Walden*, 303 Ga. 358 (812 SE2d 244) (2018) ("There is no requirement that only verbatim pattern charges are permissible."); *Showers v. State*, 353 Ga. App. 754, 760 (2) (b) (ii) (839 SE2d 245) (2020) ("It is well-established that jury instructions do not need to track, exactly, the language of pattern jury instructions." (punctuation omitted)). In fact, in some cases, this Court has disapproved of language in a pattern instruction. *See, e.g.*, *White v. Stanley*, 369 Ga. App. 330, 337-38 (1) (893 SE2d 466) (2023) (holding that the trial court erred in giving Georgia's then-current pattern jury instruction on "preponderance of the evidence").

[30] *Wright v. State*, 365 Ga. App. 288, 289 (1) (878 SE2d 137) (2022) (punctuation omitted); *see Walker v. State*, 311 Ga. 719, 722 (2) (859 SE2d 25) (2021) ("Whether the evidence was sufficient to warrant the requested [jury] instruction is

must be evaluated in "the context of the trial court's jury instructions as a whole."[31]

Indeed, the only requirement regarding jury charges is that they were, as given, "correct statements of the law and, as a whole, would not mislead a jury of ordinary intelligence."[32] An erroneous charge, then, "does not warrant a reversal unless it was harmful and, in determining harm, the entirety of the jury instructions must be considered."[33] Even so, erroneous charges are "presumed to be prejudicial and harmful, but this is not conclusive because the presumption of harm which arises from

a legal question, which we review *de novo*." (punctuation omitted)).

[31] *Wright*, 365 Ga. App. at 289 (1) (punctuation omitted); *see Walker*, 311 Ga. at 724 (3) ("When we are presented with a claim that a particular instruction is misleading, we do not evaluate jury charges in isolation, but rather consider them as a whole to determine whether there is a reasonable likelihood the jury improperly applied a challenged instruction." (punctuation omitted)); *Fassnacht v. Moler*, 358 Ga. App. 463, 475 (1) (b) (855 SE2d 692) (2021) (explaining that jury charges and recharges must be read as a whole).

[32] *Wright*, 365 Ga. App. at 289 (1) (punctuation omitted); *accord Pye v. State*, 322 Ga. App. 125, 129 (2) (742 SE2d 770) (2013).

[33] *Wright*, 365 Ga. App. at 289 (1) (punctuation omitted); *accord Williams v. State*, 267 Ga. 771, 773 (2) (a) (482 SE2d 288) (1997); *Mubarak v. State*, 305 Ga. App. 419, 421 (2) (699 SE2d 788) (2010).

a charging error may be overcome by a review of the record as a whole."[34] With these guiding principles in mind, we turn to the specific charges being challenged.

(a) Boone claims the trial court erred in giving the jury a "no-guarantee" instruction.

As an initial matter, it is undisputed that the version of the no-guarantee instruction shown to the jury on a PowerPoint presentation differs slightly from the version contained in the trial transcript. Specifically, the instruction shown to the jury in writing was as follows:

> Physicians do not guarantee the results of treatment, and in the absence of a breach of the standard of care, *proof* that the outcome of treatment was different than that expected neither establishes [n]or supports an inference that the standard of care was violated.[35]

.

---

[34] *Payne v. Thompson*, 234 Ga. App. 533, 533 (507 SE2d 257) (1998) (punctuation omitted); *see McCorkle v. Dep't of Transp.*, 257 Ga. App. 397, 404 (4) (571 SE2d 160) (2002) ("When an error in the charge of the court is shown to exist, it is presumed to be prejudicial and harmful, and this court will so hold unless it appears from the entire record that the error is harmless." (punctuation omitted)).

[35] (Emphasis supplied).

And the trial transcript reflects that the instruction was as follows:

> Physicians do not guarantee the results of treatment and an absence of a breach of the standard of care *proves* that the outcome of the treatment was different that expected, neither establishes or supports an inference that the standard of care was violated.[36]

On appeal, Boone acknowledges the instruction noted in the transcript "simply does not make any sense" and is "almost certainly incorrect[.]" So, Boone focuses her argument instead on the instruction as "requested or intended[,]"[37] rather than "the clearly erroneous instruction in the record." And because it is unclear whether the transcript contains a typographical error (although Boone certainly seems to presume it does), we address the written jury instruction that was indisputably shown to the jury.

---

[36] (Emphasis supplied).

[37] The instruction as requested by the defendants, which is nearly identical to the instruction on the PowerPoint reads, "I charge you that a medical provider does not guarantee the results of treatment and that in an absence of a breach of the standard of care, proof that the outcome of treatment from that expected or was followed by disastrous instead of beneficial results neither establishes nor supports an inference that the standard of care was violated."

Specifically, Boone maintains that the no-guarantee instruction is "functionally an argument that bad outcomes are not to be considered in determining whether or not the standard of care was violated."[38] This is simply not the case. Instead, the instruction plainly states that even *if* a medical decision has a negative outcome, a plaintiff must also establish that the applicable *standard of care was breached*. And needless to say, such a breach is an essential element of a medical-malpractice claim.[39] Put another way, the jury charge instructs that a bad outcome cannot be the *sole* basis for a malpractice claim if it is not shown the medical professional breached the relevant standard of care. This comports with our "well-settled principle of

---

[38] Boone contends that in cases (like this one) involving the *lack* of medical treatment, the no-guarantee instruction is inappropriate. But she provides no legal authority suggesting that medical-malpractice claims involving an affirmative *decision* to administer or *not to administer* certain medical treatment are different in any material way, much less as to a doctor's ability to guarantee positive outcomes. In fact, Boone's entire claim is that Dr. Chervu's decision *not to administer* DAPT prior to Thacker's surgery violated the standard of care and produced negative results.

[39] *See Zwiren v. Thompson*, 276 Ga. 498, 499 (578 SE2d 862) (2003) ("Three essential elements to establish liability in a medical[-]malpractice action have emerged from the statute: (1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." (punctuation omitted)).

negligence law that the occurrence of an unfortunate event is not sufficient to authorize an inference of negligence."[40]

Regardless, this Court approved a nearly identical jury instruction in *Hodges v. Effingham County Hospital Authority*:[41]

> [A] hospital does not guarantee the results of its care and proof alone that the outcome of the care is different from that expected or is followed by disastrous instead of beneficial results neither establishes nor supports an inference of want of proper care, skill or diligence on the part of the hospital nurses.[42]

And in *Hill v. Hospital Authority of Clarke County*,[43] this Court approved the following jury instruction:

---

[40] *Wilson v. Guy*, 356 Ga. App. 509, 511 (1) (848 SE2d 138) (2020) (punctuation omitted); *see Wolfe v. Carter*, 314 Ga. App. 854, 859 (2) (b) (726 SE2d 122) (2012) ("[I]t is a well settled principle of negligence law that the occurrence of an unfortunate event is not sufficient to authorize an inference of negligence." (punctuation omitted)); *Hill v. Hosp. Auth. of Clarke Cnty.*, 137 Ga. App. 633, 639-40 (II) (4) (224 SE2d 739) (1976) (noting that, in regards to a no-guarantee instruction similar to the one at issue here, "[t]he language of the charge is in accord with the general principles of negligence law that the occurrence of an unfortunate event is not sufficient to authorize an inference of negligence").

[41] 182 Ga. App. 173 (355 SE2d 104) (1987).

[42] *Id.* at 177 (5) (punctuation omitted).

[43] 137 Ga. App. 633.

I charge you that a hospital does not guarantee the results of a treatment or operation, and that in the absence of negligence as a matter of fact or as a matter of law on the part of the hospital or its employees or agents, proof simply that an operation or treatment is different in its outcome from that expected, or is followed by disastrous instead of beneficial results neither establishes nor supports an inference of lack of proper care, skill or diligence on the part of the employees of the hospital.[44]

Finally, in *Brannen v. Prince*,[45] we approved the following jury instruction:

[P]ysicians do not guarantee the results of treatment or operation, and that in the absence of negligence on the part of the physicians, proof simply that an operation or treatment is different in its outcome from that expected or is followed by disastrous results instead of beneficial results neither establishes nor supports an inference of lack of proper care, skill or diligence on the part of the physicians.[46]

Simply put, because we have repeatedly approved of jury instructions that are substantively the same as the one at issue here, Boone has not established that the no-

---

[44] *Id.* at 639 (4).

[45] 204 Ga. App. 866 (421 SE2d 76) (1992), *overruled on other grounds by Gillis v. City of Waycross*, 247 Ga. App. 119 (543 SE2d 423) (2000), *and Smith v. Finch*, 285 Ga. 709 (681 SE2d 147) (2009).

[46] *Id.* at 871 (8).

guarantee jury instruction was an incorrect statement of law or had the potential to confuse the jury. As a result, the trial court did not err in giving this jury charge.[47]

(b) Boone also argues the trial court erred in giving this "differing-views" jury instruction:[48]

> Testimony showing a difference of views between physicians regarding the medical judgment exercise is insufficient to support an action for malpractice where it is shown that the procedure preferred by each or the judgment exercised is an acceptable and customary method under the standard of care I have given you.

------

[47] *See Sagon v. Peachtree Cardiovascular & Thoracic Surgeons, P.A.*, 297 Ga. App. 379, 382-83 (677 SE2d 351) (2009) (holding the trial court did not err in giving a certain jury instruction when, "viewed in their entirety, the trial court's jury instructions gave a full and correct statement of the law regarding the standard of care that applied to all of the professional health care providers and were not confusing in defining the professional negligence issue"); *West v. Breast Care Specialists, LLC*, 290 Ga. App. 521, 522 (1) (659 SE2d 895) (2008) (holding a jury charge was proper when it "gave a full and correct statement of the law regarding the care and skill required of a physician and the proof required at trial to support a claim of medical malpractice"); *see also White*, 369 Ga. App. at 332 ("[T]he only requirement regarding jury charges is that they were, as given, correct statements of the law and, as a whole, would not mislead a jury of ordinary intelligence." (punctuation omitted)).

[48] The appellees and portions of the record also refer to this instruction as a "personal-practices" charge.

Specifically, Boone contends the foregoing charge instructed the jury to presume the absence of negligence and that the plaintiff's "experts' testimony of standard of care violations is insufficient to support a malpractice claim if there is any evidence on the other side." But this instruction did not direct the jury to presume *anything* or in any way suggest it should disregard a plaintiff's expert if a defense expert testifies. Instead, it simply acknowledged that there can be more than one way to satisfy the applicable standard of care, and the mere fact that medical experts disagree on how to do so does not, in and of itself, prove medical malpractice.

Moreover, the Supreme Court of Georgia has advised that a differing-views instruction *should* be given when medical experts testify. Specifically, in *Condra v. Atlanta Orthopaedic Grp., P.C.*,[49] our Supreme Court addressed an argument that allowing experts in medical-malpractice cases to testify as to their personal practices is "likely to confuse the jury by conflating the standard of care with an expert's personal protocols."[50]

---

[49] 285 Ga. 667 (681 SE2d 152) (2009)

[50] *Id.* at 672 (1).

In doing so, the *Condra* Court explained,

> any potential confusion created by the admission of such evidence may be remedied through the use of careful jury instructions. Such instructions should, for example, clearly define the legal meaning of standard of care; enunciate the principle that a *mere difference in views between physicians does not by itself prove malpractice.*[51]

And here, Boone has not identified any material distinction between the trial court's differing-views instruction and the language our Supreme Court suggested that trial courts should use in *Condra*.

Boone further claims the trial court improperly suggested it provided the jury with the applicable standard of care when it is for the jury to make that determination. Specifically, Boone challenges the portion of the instruction noting that, ". . . where it is shown that the procedure preferred by each or the judgment exercised is an

---

[51] *Id.* Boone claims the trial court's differing-views jury instruction is similar to one this Court disproved of in *Byrd v. Medical Center of Central Georgia, Inc.*, 258 Ga. App. 286 (574 SE2d 326) (2002). But even if that were arguably true, we are nevertheless bound by our Supreme Court's decision in *Condra. See Thompson v. State*, 358 Ga. App. 553, 557 (1) (855 SE2d 756) (2021) ("Although [the appellant] argues that this well settled authority should no longer be followed in Georgia, we are bound by the opinions of the Supreme Court."); *Whorton v. State*, 321 Ga. App. 335, 339 (1) (741 SE2d 653) (2013) (noting that "vertical stare decisis dictates that we faithfully adhere to the precedents established by the Supreme Court of Georgia").

acceptable and customary method under the *standard of care I have given you.*"[52] But this statement cannot be read in a vacuum. Boone has not identified anywhere in the record, transcript, or jury instructions where the trial court provided the jury with the specific medical standard of care for medicating TCAR patients. And just prior to the jury charge at issue, the trial court instructed the jury on the *general legal* definition of "standard of care." So, considering the jury instructions as a whole (as we must), it is clear the trial court was referencing the legal definition of the phrase, not the specific medical standard of care applicable in *this* case. The trial court did not err, then, in giving a differing-views instruction nearly identical to the one approved of in *Condra.*[53]

For all these reasons, we affirm the jury's verdict in favor of the appellees.

*Judgment affirmed. Brown and Padgett, JJ., concur.*

---

[52] (Emphasis supplied).

[53] *See supra* note 47.